LACKAWANNA STEEL CO. ET AL. *v.* UNITED STATES (No. 1993).[1]

1. CONSTRUCTION—PROCESSES FOR FACILITATING TRANSPORTATION.

Numerous provisions of the tariff act expressly grant to importers the right, without increase of duty, to so fashion their merchandise as will facilitate transportation. This right will not be denied to an importer by holding such a process a manufacture or a partial manufacture because it may incidentally be a benefit to the ultimate manufacture of the merchandise in this country.

2. CONSTRUCTION, PARAGRAPH 614, TARIFF ACT OF 1913—"UNMANUFACTURED"—AIDED BY CONTEXT—ALL PARTS OF STATUTE TO BE GIVEN EFFECT.

Paragraph 549, tariff act of 1913, grants free entry to "Minerals, crude, or not advanced in value or condition by refining or grinding, or other process of manufacture * * *." Paragraph 614 grants free entry to "limestone, unmanufactured." Paragraph 81 levies duty upon "earthy or mineral substances whether wholly or partially manufactured." Had Congress intended limestone, which had been "advanced in value or condition by refining or grinding, or by other process of manufacture," to be denied free entry, the provision of paragraph 614 for "limestone, unmanufactured," would be idle and surplusage, for it would have been already accomplished by paragraph 549. Congress singled out limestone from paragraphs 81 and 549 for special consideration in paragraph 614, so that limestone, unless completely manufactured, is entitled to free entry under paragraph 614.

3. CRUSHED LIMESTONE.

Limestone crushed to diameters of from one-sixteenth inch to 4 inches to facilitate transportation, and needing to be subjected to other manufacturing processes before being used, is admissible free of duty under paragraph 614, tariff act of 1913, as "limestone, unmanufactured," and not dutiable under paragraph 81 as "Earthy or mineral substances wholly or partially manufactured."

## United States Court of Customs Appeals, March 24, 1920.

APPEAL from Board of United States General Appraisers, Abstract 43180.

[Reversed.]

*Albert MacC. Barnes, jr.* (*Frank M. Halstead* of counsel), for appellants.
*Bert Hanson,* Assistant Attorney General (*John J. Mulvaney* and *Samuel Isenschmid,* special attorneys, of counsel), for the United States.

[Oral argument Feb. 26 and 27, 1920, by Mr. Halstead and Mr. Mulvaney.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

While there is controversy herein as to the representative character of the two collective samples in evidence, it may well be assumed for the purposes of this case that those offered by the Government as official samples are representative of the importations. They consist of mixed pieces of stone concededly ranging in sizes of from one-sixteenth of an inch to 4 inches in dimensions. The importations were of carload lots by The Lackawanna Steel Co., at the port of Buffalo, and shipped by the Canadian Crushed Stone Co., which company quarried the stone at and shipped it from Dundas, Ontario,

---

[1] T. D. 38359 (38 Treas. Dec., 283).

Canada. While the record is not as clear as might be desired, it does make certain that the stone is limestone of a variety known as dolomite. The stone is first blasted out of the cliff at the quarry; this results in pieces "from nothing * * * up to twenty tons." The larger pieces have to be reblasted before they can be handled. It is handled at the quarry with a steam shovel. The stone thus blasted is then transported across the quarry to the "breaker," which is described as "a big crusher breaker; a big cast-iron machine." "It has a jaw, a crusher—a big head in the middle which gyrates like a coffee grinder." The Canadian Crushed Stone Co. has two of these crusher breakers at its plant, each producing different-sized crushed stone. They can be "set" to produce the size of crushed stone desired, from a little larger than 2 inches up to about 6 or 8 inches in size. With the aid of these two crusher breakers the company can turn out crushed stone of any size it desires between those two limits. After leaving the crusher the crushed stone goes upon what is called a "belt conveyor," which "runs from the crusher to the bin building * * * something over 100 feet distance away." At this point the material can be diverted to run either directly into bins to be therefrom loaded on the cars or by another course into a screen.

It is fairly shown by this record that in producing these importations by this appellant the stone, for facility in production, travels over both courses. The screen is a long cylindrical one, commencing with a small mesh and going to larger ones. The crushed stone goes through it, as it revolves, and drops through the different-sized meshes into separate bins, so that the crushed stone in each bin is practically uniform in size. The meshes of this screen run from three-eighths of an inch up to 3 inches in size. Thereafter the cars are indiscriminately loaded from all the bins, whereby the screened and unscreened rock is mixed with the resultant product above described and as represented by the official exhibit. The effective process employed, therefore, which puts the stone in its imported condition is the crusher, and, as imported, this stone is, therefore, not of uniform or selected sizes. The testimony is uncontradicted that these importations are of the crudest forms produced by the exporters, and that it is rendered into the imported sizes solely to facilitate and economize in transportation. The record also fairly establishes, and it is nowhere therein controverted by any testimony, but, on the contrary, comports with careful and economical business methods, that producers of stone to be sold for a variety of purposes would so render it, as is here done, that the particles could be loaded reasonably close together in cargo in economy of space and could be handled by ordinary methods of labor instead of extraordinary devices.

The record further makes clear that these exporters at the same plant produce and extensively market stone which is screened, thereby producing such in comparatively uniform sizes, for road work, building construction, and other uses, which uses demand materials thus treated; and that this screened stone is higher in price than that sold these importers. Such screened stone as imported is ready for its ultimate use as material for construction. These importations, however, are not so ready for ultimate use. On the contrary, they must undergo several processes, *including* a preliminary one of crushing, before they are made ready for ultimate use. The record clearly establishes that the crushing at the quarries for the purposes of transportation does not supersede and render unnecessary crushing at the destination of and for final use. These further crushing and other processes are described by a representative of the importing firm as follows:

This stone is used by us in the open-hearth furnaces in the condition of calcine [calcined] dolomite, and after receipt by us it is first crushed. It is first—the cars are taken on a large car dump and bodily turned over. They drop through a hopper into a bin that will hold perhaps two cars. From that bin it is lifted by a belt conveyor to a bin that will hold perhaps four carloads. *From that bin it goes by means of another belt conveyor to a gyrating crusher that is set at perhaps two and a half inches.* From that first crusher *it goes to a roll crusher that is set at one inch or one inch and a quarter.* From that roll crusher it is elevated again by means of a belt conveyor to a bin holding perhaps 150 to 160 tons, three or four carloads; and this bin is placed at the receiving end of a long incline kiln. This kiln is 125 feet long, 8 feet in diameter, and a long cylindrical steel drum that is inclined one-half inch to the foot. This kiln is lined with a refractory material, and the crushed stone is introduced at one end. As the kiln revolves, this stone, of course, gradually works its way down. Now, the function of this inclined kiln is to calcine the stone. For that purpose it is fired with dry pulverized coal, which is, of course, blown in at the other end. When the stone is thoroughly calcined—it has to be raised to a full red heat, and the carbon dioxide thoroughly driven off—it is not yet finished. That discharged from the kiln drops into a cooling cylinder, which is merely a steel cylinder that is 30 feet long and about 4 feet in diameter, known as "Z" bars, made—perhaps made of "Z" iron. As that kiln rotates it carries this calcined material up and drops it down through the air to cool it, the function of that second cylinder being to cool the material. *From that cooler it goes to another roll crusher, set at a quarter of an inch.* That calcined, fine material is then taken to the open-hearth furnaces for use. (Italics ours.)

While the crushing at the quarry may necessarily have facilitated the crushing at the point of ultimate use, by rendering larger or more powerful crushing machinery unnecessary, upon the facts of this record it can not be said that the former was done as a manufacturing process for any particular use, or for any such purpose whatsoever. This is made clear by the conceded fact that as imported the stone could, by the application of appropriate processes, be used for a number and variety of uses, and there was nothing about it or process employed upon it as imported which indicated or rendered it suitable only for its above-described use by these appellants.

But conceding that such was the case, this record incontrovertibly showing that this crushing was done solely to facilitate transportation, which obviously it does, the court is not prepared to deny importers this right because perchance it may also benefit the ultimate consumer. That this is not the intent of the Congress is witnessed by numerous provisions of the act expressly granting importers the right without increase of duty to so fashion their merchandise as will facilitate transportation. The court is not prepared, therefore, to penalize importers for availing themselves of the express grants or the spirit of the law by holding such manipulations a manufacture or a manufacture in part of the importation, rather than a processing in aid of careful and economical transportation.

Upon arrival at the port of Buffalo the particular importations were classified for dutiable purposes by the collector thereat as "Earthy or mineral substances wholly or partially manufactured," as provided in paragraph 81 of the tariff act of 1913. The importers, who are appellants here, duly protested, claiming among other matters the merchandise free of duty, either under paragraphs 549 or 614 of said act, reading:

549. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for in this section.

614. Stone and sand: Burrstone in blocks, rough or unmanufactured; rotten stone, tripoli, and sand, crude or unmanufactured; cliff stone, freestone, granite, sandstone, and limestone, unmanufactured, and not suitable for use as monumental or building stone; all of the foregoing not specially provided for in this section.

The board overruled the protests and importers appeal. That the importations are limestone and not suitable for monumental or building stone is conceded. In this court the appellants confine their claim to the provisions of paragraph 614 for "limestone, unmanufactured."

The legislative conspectus is instructive. All three paragraphs, 81, 549, and 614, concededly cover the importations and each in the absence of the others would include the merchandise. The three paragraphs, therefore, must be read together so as, if possible, to give some effect to all. Obviously had Congress intended *limestone* which had been only "*advanced in value or condition* by refining or grinding, or by *other process of manufacture*" (italics ours) should be denied free entry, the provision of paragraph 614 for "limestone, unmanufactured," would be idle and surplusage, for that was already accomplished by the general provisions of paragraph 549. Having so provided, however, by paragraph 549, Congress proceeded by paragraph 614 to *eo nomine* differently legislate with reference to "limestone." It therein provided that as to "limestone" all such as was "unmanufactured," that is, all such which had not been so manipulated as to have reached the status of a manufacture, should be free. All gradations of limestone manipulated to stages preceding that which

constituted it a "manufacture" were here granted free entry. So that reading together the three paragraphs, in order to give some effect to each, we must read them as follows: (81) "Earthy or mineral substances whether wholly *or partially* manufactured" shall be dutiable; and (549) only those minerals that are "crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture," shall be free; providing, however, (614) that the mineral known as "limestone" when "unmanufactured," that is, all "limestone" that is not manufactured, shall be free. Congress here singled out limestone from the provisions of both paragraphs 81 and 549 for special consideration, and, unless Congress meant to provide by 614 that all limestone advanced in value or condition to those degrees short of a manufacture should also be free, that provision of paragraph 614 is idle and of no force or effect whatever, 549 having previously effected its import.

Wherefore it becomes apparent that unless these importations are completely manufactured articles or materials they are entitled to free entry under paragraph 614, and that this case is not ruled by the citations and cases wherein other and different provisions of law were construed.

In view of the many familiar decisions upon the subject, these materials in no wise respond to the definitions of a manufacture. We quote a few. In Hartranft *v*. Wiegmann (121 U. S., 609, 615), the Supreme Court said:

> We are of the opinion that the shells in question here were not manufactured, and were not manufactures of shells, within the sense of the statute imposing a duty of 35 per centum upon such manufactures, but were shells not manufactured and fell under that designation in the free list. They were still shells. They had not been manufactured into a new and different article having a distinctive name, character, or use from that of a shell. The application of labor to an article, either by hand or mechanism, does not make the article necessarily a manufactured article within the meaning of that term as used in the tariff laws.

In Baumgarten *v*. Magone (50 Fed., 69, 71) is found a succinct definition, as follows:

> The mere fact of the application of labor to an article, either by hand or by mechanism, does not make the article necessarily a manufactured article within the meaning of that term as used in the tariff laws, unless the application of such labor is carried to such an extent that the article suffers a species of transformation and is changed into a new and different article, having a distinctive name, character, or use.

The latest expression of the Supreme Court is perhaps had in Anheuser-Busch Brewing Association *v*. The United States (207 U. S., 556, 562), declaring:

> Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann*, 121 U. S., 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character, or use."

*Reversed.*