GULF GYPSUM CO. *v.* UNITED STATES, UNITED STATES GYPSUM CO.
APPEARING AS PARTY IN INTEREST (No. 3460)[1]

United States Court of Customs and Patent Appeals, May 23, 1932

*Harlan W. Rippey* for appellant.
*Puckhafer, Rode & Tompkins (John E. MacLeish and George J. Puckhafer* of counsel) for party in interest.

[Oral argument April 14, 1932, by Mr. Rippey and Mr. Puckhafer]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The controversy involved in this appeal was initiated by appellant, Gulf Gypsum Co., under the provisions of section 516 (b) of the Tariff Act of 1922, wherein an "American manufacturer, producer, or wholesaler" is authorized, upon the conditions of the section being complied with, to file protest against a classification by the collector of customs of imported merchandise "of a class or kind manufactured, produced, or sold at wholesale by him" in the United States.

Among other things it is made the duty of one protesting under said section to set forth a description of the merchandise and allege "the classification and the rate of duty he believes proper."

[1] T. D. 45725.

No question is raised in the hearing before us as to the sufficiency of appellant's pleadings, nor as to the condition of the statute having been complied with.

The merchandise consists of gypsum rock, to be hereinafter more particularly described, imported from Canada by the United States Gypsum Co. which appears as the party in interest, the United States being the nominal appellee.

The merchandise was liquidated by the collector as free of duty under paragraph 1643, Title II (the free list title), of said Tariff Act of 1922, the paragraph reading:

PAR. 1643. Plaster rock or gypsum, crude.

The protest of appellant described the merchandise as having—

been subjected to a crushing or grinding or reduction and/or manufacturing process in Canada before importation thereof,

and alleged it was not "crude within the meaning of the provisions of paragraph 1643 * * *." Also, it contained the further allegation that the articles and merchandise—

were minerals advanced in value and/or condition by refining or grinding, or by other process of manufacture and were not included within the meaning of any provision of Title II of the said Tariff Act of 1922,

but were specifically exempted therefrom by paragraph 1619 of said act which free lists only "minerals, crude, or not advanced in value or condition * * *."

Appellant's claims as to proper classification were in the alternative: Viz, first, paragraph 205; second, paragraph 214; third, paragraph 1459; or, fourth, under some one of said three paragraphs, by virtue of paragraph 1460—the similitude clause of the act.

Paragraphs 205, 214, and 1459 read as follows:

PAR. 205. Plaster rock or gypsum, ground or calcined, $1.40 per ton; white nonstaining Portland cement, 8 cents per one hundred pounds, including the weight of the container; Keene's cement, and other cement of which gypsum is the component material of chief value, valued at $14 per ton or less, $3.50 per ton; valued above $14 and not above $20 per ton, $5 per ton; valued above $20 and not above $40 per ton, $10 per ton; valued above $40 per ton, $14, per ton; other cement, not specially provided for, 20 per centum ad valorem.

PAR. 214. Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not, if not decorated in any manner, 30 per centum ad valorem; if decorated, 40 per centum ad valorem.

PAR. 1459. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

In addition to the foregoing appellant has also invoked section 502 (b) of the Tariff Act of 1922 to which reference will be made later.

The protests were overruled by the Customs Court in an elaborate and evidently carefully considered opinion by Judge McClelland, Judge Brown specially concurring, with an opinion making certain comments upon the nature of proceedings had under said section 516 (b).

The opinion of Judge McClelland states—

Two facts are established beyond dispute by the record; one, that the gypsum involved passed through a crusher, and the other, that except as to the reduction in size resulting from passing through the crusher the gypsum is in exactly the same condition physically as it existed in nature before being quarried. Whether, therefore, plaintiff is entitled to succeed depends largely, if not altogether, on whether the gypsum is no longer crude within the meaning of paragraph 1643, *supra*, because of the crushing process through which it passed after being quarried and before being exported.

A thorough and careful examination of the well-prepared record in the case convinces us that the findings of fact by the Customs Court are fully and amply sustained by the testimony of many witnesses for both parties in interest.

It is established that prior to about 1920 the method of mining and handling crude plaster rock or gypsum ("plaster rock" and "gypsum" being synonymous terms) was that the rock would first be quarried, usually by blasting with explosives, and the large lumps of rock thus loosened were broken into irregularly shaped pieces of an average of eight or ten inches in diameter by the use of sledge hammers wielded by hand. The blasting operation itself produced much material of irregular size, some of the lumps requiring no further breakage or reduction in size in order to be handled for shipment and some of the material being reduced to a form described as dust.

The above method of breaking by sledge hammer apparently still continues in some mines, but beginning about 1920–1922 some of those engaged in the business of mining such rock began to substitute machinery for the sledge-hammer process of breakage.

This machinery was capable of being so adjusted as to crush or break the large lumps of rock into smaller pieces of different sizes. The testimony and representative samples before us indicate that the sizes of the rocks so broken by machinery range from two to six inches or more in diameter, and that the sizes produced by the machine action are probably more regular and uniform than were or are those resulting from the sledge-hammer process.

In the machine process there is also a process of screening to remove some of the dirt from the rock.

No chemical change whatever results from the machine process. The material remains in all respects precisely in the same condition as was that material produced by the blows of sledge hammers, except that the lumps produced by machine action may be somewhat more regular and smaller in dimension.

After importation, in order to prepare the material for the ultimate uses intended, the lumps of rock produced by the machinery must be further processed, and the record satisfactorily establishes that in this further processing every step which was required in reducing the sledge-made material must be utilized.

In other words, the machine-reducing process, at or near the point of quarrying, does not advance the material any nearer to the condition suited for its ultimate use or uses than did the more primitive method of breaking or reducing by sledge hammer.

The evidence clearly establishes that the purpose of the reduction in both instances is the same, viz, to place the material in suitable condition for transportation by the methods now used for such transportation.

Paragraph 1643 provides simply for crude gypsum, the pertinent portion of paragraph 205, for "gypsum, ground or calcined."

One of the uses of the most finely ground raw gypsum is as a land plaster or fertilizer; another is in the making of wall plaster. For these uses it is ground to a pulverized state. Still another use is as a cement retarder. For this use the rock is reduced to sizes ranging from one-half inch to one inch or more in dimension and in this condition it is mixed with the other material used in making cement and all is ground to a powdery form together.

It seems to be virtually conceded by counsel for the party in interest as appellee that gypsum rock reduced to the conditions immediately above described would be properly classifiable as ground rock and take the same duty as calcined gypsum, calcining being a process of burning to fit it for certain uses.

The material here at issue is not, in the condition as imported, suited to any of the foregoing uses nor to any use whatsoever without being further processed through exactly the same stages as was and is the sledge-hammer material.

Certainly in the common acceptation of the terms, the imported material is "crude" and not ground. Definitions of "crude" are as follows:

Webster: 1. In a natural state; not cooked or prepared by fire or heat; not altered, refined, or prepared for use by any process; raw; as, *crude* flesh, *crude* sugar.

Century: 1. Being in a raw or unprepared state; not fitted for use by cooking, manufacture, or the like; not altered, refined, or prepared by any artificial process; not wrought; as, *crude* vegetables; the *crude* materials of the earth; *crude* salt; *crude* ore.

Standard: 1. In a state needing preparation for use in manufacture or in mercantile exchange; not refined; raw; as, *crude* petroleum; *crude* material.

Definitions of "grind," of which "ground" is the past participle, are—

Webster: 1. To reduce to fine particles or powder by crushing and friction; triturate; as to grind wheat.

Century: 1. To break and reduce to fine particles by pounding, crushing, or rubbing, as in a mill or a mortar, or with the teeth; * * *.

2. To produce by grinding, or by action comparable to that of grinding; as, to grind flour.

The case of *Lackawanna Steel Co. et al.* v. *United States,* 10 Ct. Cust. Appls. 93, T. D. 38359, cited and quoted from by the Customs Court in the instant case, arose under the Tariff Act of 1913. It involved importations of limestone "crushed to diameters of from one-sixteenth inch to 4 inches." The issue as finally submitted to this court was between a provision in said act for "earthy or mineral substances wholly or partially manufactured" (the same language as that contained in paragraph 214 of the Tariff Act of 1922 which is the basis of one of appellant's alternative claims) and "limestone, unmanufactured" provided for in paragraph 614 of said 1913 act.

This court, in an opinion by Judge De Vries, held the material to be classifiable as unmanufactured limestone.

The contesting paragraph for land plaster or crude gypsum here involved was not, of course, there at issue, but what was there said is here highly instructive, and the reasoning of that case is, we think, here applicable as to both paragraphs 205 and 214 of the Tariff Act of 1922.

This court, among other things, said:

* * * The stone is first blasted out of the cliff at the quarry; this results in pieces "from nothing * * * up to twenty tons." The larger pieces have to be reblasted before they can be handled. It is handled at the quarry with a steam shovel. The stone thus blasted is then transported across the quarry to the "breaker," which is described as "a big crusher breaker; a big cast-iron machine." "It has a jaw, a crusher—a big head in the middle which gyrates like a coffee grinder." The Canadian Crushed Stone Co. has two of these crusher breakers at its plant, each producing different-sized crushed stone. They can be "set" to produce the size of crushed stone desired, from a little larger than 2 inches up to about 6 or 8 inches in size. * * *

* * * The effective process employed, therefore, which puts the stone in its imported condition is the crusher, and, as imported, this stone is, therefore, not of uniform or selected sizes. The testimony is uncontradicted that these importations are of the crudest forms produced by the exporters, and that it is rendered into the imported sizes solely to facilitate and economize in transportation. The record also fairly establishes, and it is nowhere therein controverted by any testimony, but, on the contrary, comports with careful and economical business methods, that producers of stone to be sold for a variety of purposes would so render it, as is here done, that the particles could be loaded reasonably close together in cargo in economy of space and could be handled by ordinary methods of labor instead of extraordinary devices.

In *United States* v. *C. J. Tower & Sons,* 17 C. C. P. A. (Customs) 90, T. D. 43427, this court, in an opinion by Presiding Judge Graham, held that ground wood shavings for use in making wood flour were dutiable as "waste" under paragraph 1457, Tariff Act of 1922, rather than as unmanufactured articles not enumerated under paragraph

1459 of said act (paragraph 1459 being another paragraph under which appellant here makes an alternative claim).

Having here found the shavings which had been ground to have been waste before grinding, this court said—

> The record discloses that the only object of the grinding of the imported material was for convenience and economy in packing and shipping and that no other purpose was accomplished. This brings the case squarely within the rule announced by us in several cases.

*Ætna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T. D. 38238, affirmed in 256 U. S. 402; *United States* v. *American Chicle Co.*, 10 Ct. Cust. Appls. 98, T. D. 38360, and *Gudewell & Bucknell* v. *United States*, 142 Fed. 214, in addition to the *Lackawanna Steel Co.* case, *supra*, were cited, commented upon, and applied by this court in the *Tower* case, *supra*, and were cited and relied upon by the United States Customs Court in the instant case.

Appellant has here endeavored to distinguish between each of those cases and the case at bar. To the extent that crude gypsum was not involved in those cases, of course, the facts are different, but to the extent that the principle relating to conditioning material for convenience and economy in packing and shipping was there involved the cases were entirely analogous to the instant case.

Appellant here insists that in order to arrive at the congressional intent as to the meaning of the terms "crude" and "ground," the—

> tariff history, decisions of the courts and officers charged with the administration of the act and the history of the times with reference to the subject before the court,

should be considered.

It may be well questioned whether the gypsum paragraphs of the Tariff Act of 1922 have ambiguities which require this, as an aid in arriving at congressional intent, but out of deference to the insistence of appellant's counsel we have examined same in so far as, under any circumstances, same might, by any possibility, or upon any surmise, be deemed essential or proper.

The brief of appellant, however, goes into detail as to tariff acts from 1790 to the present to an extent not necessary to be here recited, notwithstanding the interesting history contained therein.

Appellant's brief says—

> The  *  *  *  history of the gypsum paragraphs shows gypsum, or plaster of Paris, has been specifically provided for in the tariff acts for almost a hundred years; that until 1897 gypsum was recognized and provided for in all acts as "ground," "unground," and "calcined"; that in the 1897 act "crude" was substituted for "unground"; that since the 1897 act Congress has classed gypsum as "crude," "ground," "calcined."

The brief then recites that in 1875, before the word "crude" had been introduced into tariff law in connection with gypsum and while

"unground" was the term used to describe the raw material, there were two rulings by secretaries of the Treasury which—

&ast; &ast; &ast; settled the question as to whether or not cracked, crushed, or ground gypsum could be imported as unground or crude and rule in this case unless by this court overruled.

This contention we shall later discuss.

The brief further recites that for a number of years prior to the Tariff Act of 1897 (the Dingley law) "unground," in the sense of "crude," gypsum was on the free list; that in said act a duty of 50 cents per ton was imposed upon "plaster, rock or gypsum, crude," and $2.25 per ton for gypsum "if ground or calcined"; that the Tariff Act of 1909 placed a duty upon gypsum "if ground," and that the Tariff Act of 1913 made all gypsum dutiable at a uniform rate.

It is then further asserted in the brief that when the bill which eventuated in the Tariff Act of 1922 was before the committees of Congress there was, as had been the case at the framing of a number of previous tariff laws—

a struggle between the domestic producers of gypsum and the importers of gypsum over the question of a tariff;

that the meaning of the word "crude" was not in question, having been fixed by the ruling of 1875 above referred to; that the importers, believing that if the act of 1922 were worded as was the act of 1909 they would not be able to secure—

the free entry of gypsum which had been subjected to a mechanical crushing or grinding action prior to importation,

sought a change in wording; that a representative of the importers before the Senate Committee on Finance called attention to the wording of the act as it had passed the House and pointed out that there the distinction was between crude gypsum and ground gypsum, and that, under the provisions of that act, the importers would be unable to find free entry for crushed or ground gypsum. The brief then continues:

Senator Smoot, chairman of the Finance Committee, made the statement that the distinction as drawn in the 1913 act, which was then in force, was the same as had been drawn in previous acts, and that the law had been administered accordingly; that no difficulties in its administration had developed, and that if a change was made in the distinction, it would in all probability lead to court action, and that, therefore, there would be no change in the new law, and the 1922 law was written with the same wording as the previous act.

We are unable to agree to the soundness of the argument that congressional intent is to be deduced from any argument or statement made by a representative of the importers before the committee of the Congress, unless there were some language in the act of Congress itself evidencing an agreement therewith. To accept the interpretation of an interested party made in an argument before a legislative committee, even though that statement be construed to be

against the interest of those he represents, would hardly be a safe rule for the courts to follow.

Neither are we able to see wherein the statement attributed to the Senate chairman of the Committee on Finance evidences the intent of Congress to have the statute given the construction for which appellant contends, even assuming, without holding, that it would be proper for the courts to consider such statement.

The statement that—

the distinction drawn in the 1913 act was the same as had been drawn in previous acts, and that the law had been administered accordingly,

is not helpful because the 1913 act made no distinction, so far as rate was concerned, in the different kinds of gypsum. Whether "crude, ground, or calcined," it took duty at 10 per centum ad valorem.

Prior to the Tariff Act of 1913, however, it is conceded that the gypsum rock in the condition to which reduced by sledge hammers was classified as either "crude" or "unground" gypsum, according to whichever of those words was used in the law upon the subject in force at the time of the importation.

So appellant's entire argument upon this point, in the final analysis, rests upon its contention that by reason of a change in method of breaking the rock, as blasted from the quarry, into smaller units the material becomes something more than crude gypsum.

So far as the Treasury rulings of 1875, relative to ground gypsum rock being subject to duty, are concerned, we are unable to see wherein they are of importance in the instant case. Since the record indicates clearly that the crushing of rock, such as is here involved, by machinery was not taking place at that date, it must be concluded that the material then ruled upon was something different from that at bar.

It is noted that the first ruling states—

* * * the words "plaster of Paris, * * * unground" * * * apply to raw stone, not so crushed or powdered as to come within the limits of the law relating to manufactured articles, * * *.

The other ruling states—

It appears, from the special report of the appraiser, that the said plaster is not in the unground or crude state but has advanced to a condition resembling, to some extent, at least, ground plaster.

It seems to us that appellant seeks to have the court do by construction what Congress, for some reason unknown to us, failed to do by legislation.

The art of breaking this rock into small particles by means of machinery, for convenience in packing and shipping, is shown to have been advanced to an entirely practical stage in 1922 when Congress enacted the law under which this controversy arose. It seems to us

that it would have been very easy for Congress, had it intended to do so, to have made the material produced by machine instead of by sledge hammers dutiable. Instead the Senate struck out the duty on crude gypsum, which the House had provided to supplant the duty imposed under the act of 1913, and placed it on the free list where it had been for some years prior to the enactment of the Tariff Act of 1897, being there described as "unground."

Since crude gypsum is *eo nomine* provided for in paragraph 1643 of the Tariff Act of 1922, and since, in our opinion, the material involved is crude gypsum, there is, of course, no occasion for the application of the similitude paragraph, 1460.

We think there was no error in the judgment of the United States Customs Court overruling the protests, and the same is *affirmed*.