CHAS. H. DEMAREST, INC. v. UNITED STATES (No. 4889) [1]

United States Court of Customs and Patent Appeals, April 30, 1957

Barnes, Richardson & Colburn (Eugene F. Blauvelt and E. Thomas Honey of counsel) for appellant.

George Cochran Doub, Assistant Attorney General, Richard E. FitzGibbon, Chief, Customs Section (William J. Vitale, trial attorney, of counsel), for the United States.

[1] C. A. D. 650.

**134**

[Oral argument April 2, 1957, by Mr. Blauvelt and Mr. FitzGibbon]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

JOHNSON, Chief Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, entered pursuant to its decision (C. D. 1790), overruling a protest against the collector's classification and duty assessment of merchandise consisting of palmyra fiber and palmyra stalks, imported from India.

The collector classified this merchandise under paragraph 1558 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as fibrous vegetable substances, manufactured, in whole or in part, at a rate of 10 per centum ad valorem.

Appellant, before the lower court, contended that the merchandise is properly duty free under the provisions of paragraph 1684 of the Tariff Act of 1930, as fibrous vegetable substances, not dressed or manufactured in any manner. Other alternative claims were made by appellant but are not pressed before this court. Appellant's protest as to certain portions of the instant importation, including merchandise identified as bassine, which is dyed palmyra fiber, has been abandoned and thus is not here involved.

The pertinent provisions of the tariff act read as follows:

Par. 1558, as modified:

Articles manufactured, in whole or in part, not specially provided for: * * * and textile grasses or fibrous vegetable substance (except istle or Tampico fiber_____ 10% ad val.

Par. 1684, of the free list:

Grasses and fibers: * * * and all other textile grasses or fibrous vegetable substances, not dressed or manufactured in any manner, and not specially provided for.

There is no dispute that the imported merchandise, both fiber and stalks, is a fibrous vegetable substance. So much is conceded. The sole issue in this case, therefore, is whether the merchandise should be classified as "manufactured, in whole or in part," under the provisions of paragraph 1558, or "not dressed or manufactured in any manner," under paragraph 1684 of the free list.

Two witnesses testified on behalf of appellant and five on behalf of the Government. No samples from the instant importation were introduced as evidence but illustrative exhibits introduced by both parties were adequately related, both as to the processing operations abroad and the use of the imported material in domestic manufacture, to this importation.

From the testimony, it appears that palmyra stalks and palmyra fiber are parts of the leaf and leaf stem, respectively, of the palmyra tree. The first step taken in the production of the stalks and fiber is the severance of the leaf stem from the tree, following which the stem is removed from the leaf.

The stems are soaked in a vat to soften, beaten to a pulpy mass, and drawn through a comb made of nails imbedded in a board (a process known as "hackling"). Hackling separates the fibers from the pulpy mass, which mass is discarded, and, as well, serves to straighten the fibers. Though nothing was said on this point by Harold H. Demarest, secretary of and a witness for appellant, Russell H. Smith, an importer of palmyra fiber and stalks and a witness on behalf of the Government, testified that at this juncture in the processing of the fiber, said fiber is sun-dried. Such drying, so the latter testified, is essential to prevent spoilage in shipment of the fiber. Also, while Demarest was silent as to whether or not the fiber is sorted according to its natural length, Smith testified that it is roughly sorted. The fiber is then trimmed at both ends and tied into bundles.

To obtain the palmyra stalks, the leaves are stripped from about their ribs and the leaves are discarded. The ribs, varying in length, are then sorted into three groups, according to their natural length, short, medium and long. Smith testified that drying is necessary at this point whereas Demarest claimed that the stalks are dry at this point in the processing. Both admitted that the stalks would spoil in shipment unless they were dry. The sorted stalks are then tied into bundles and the tips trimmed.

The foregoing represents a brief, general description of the processing done on the palmyra fiber and stalks prior to importation thereof into this country. The above mentioned trimming step, applicable to both fiber and stalks, has been set forth only generally. In the view we take of this case, however, it is essential to more carefully analyze the facts relating to this step, as we feel that what was done at this juncture in the processing is determinative of the issue before us.

The testimony of Demarest and of Smith, the only witnesses who testified as to the pre-importation processing, is somewhat conflicting on this point. A portion of the testimony of Demarest would indicate that whatever trimming is done to the fiber and stalks prior to shipment is done primarily for shipping and packing purposes; his testimony, taken as a whole, however (and not withstanding Demarest's statements to the effect that "they don't know when they trim them, frequently, what sizes are required or asked for, if asked or required" and that the orders are "normally taken out of available stocks"), indicates that much more is accomplished. Not only are the bundles of fiber and stalks reduced to uniform lengths by the trimming operation but, as well, the trimming reduces the bundles to the

approximate ordered lengths. And while Demarest stated that the fibers are ordered to approximate lengths "for packing purposes," he also testified that from 8 to 10 inches of the unusable portion of the stalks are usually trimmed off.

Smith testified that both the fiber and the stalks are trimmed to exact lengths after orders are received and that they are "measured with a ruler" and trimmed down "to eighth of an inch sizes."

The testimony of the other witnesses related primarily to processing operations conducted by broom and brush manufacturers, apparently the sole users of the imported merchandise, after the fiber and stalks are imported. Carl H. Werheim, associated with the Hoge Brush Co., a manufacturer of brooms and brushes containing palmyra stalks and fiber, and a customer of appellant, testified on behalf of the Government that upon receipt of the stalks and fiber, they are soaked to soften, sorted to remove objectionable pieces (approximately 5% of the fiber and stalks is rejected yearly) and inserted into the brush- or broom-making machine. The machine doubles-up the stalks and fiber and inserts them into holes that have been bored in the blocks, into which holes they are fastened by means of wire staples. Testimony of the other witnesses conflicted with Werheim's testimony as to whether a soaking operation is performed but all witnesses agreed that the doubled-up fiber and stalks, after insertion into the blocks, are trimmed at their ends to reduce to uniform lengths the exposed portions of fiber and stalks. Of particular note, as will hereinafter be seen, was Werheim's description of a brush (Illustrative Exhibit #3) made from 14 inch palmyra stalks. The stalks had been placed doubled-up in the block, which block had holes ½ inch deep, and a 6¼ inch length of stalk was left exposed after trimming. This would indicate that, taking into account the doubled-up stalk, 13½ inches of the 14 inch stalk remained in the brush when completely manufactured. When asked why a 15 inch stalk was not used in lieu of a 14 inch stalk (for that particular brush), Werheim replied:

Well, to eliminate too much waste. Then another thing, if it would be 15 it would stick out too far. The machine don't cut them too easy, you have to run them too often through the trimmer.

Appellant, on the basis of the foregoing testimony, contends that the processes used by the foreign supplier were employed solely to separate the useful fiber and stalks from the palmyra palm and to place the desired fibrous material in a condition convenient and economical for shipment and manufacture; that the fiber and stalks were not changed in condition and were not advanced towards their ultimate use; and that, therefore, the instant importation is not dutiable under paragraph 1558, as modified, as "articles manufactured" but rather free of duty under paragraph 1684 as "not dressed or manufactured in any manner."

The lower court on the other hand, apparently construing the "or" in "dressed or manufactured" to have been used in the conjunctive, held that the merchandise was both dressed and manufactured and dutiable under the former paragraph.

Having carefully analyzed the testimony and the facts of this case, we are of the opinion that the judgment of the Customs Court is correct and must be affirmed. In reaching this conclusion, we have found it necessary only to consider whether or not the here involved merchandise has been "manufactured," the clear wording of paragraph 1684 indicating that the "or" is used disjunctively.

The applicable law is clear. To constitute an article "manufactured" it is not necessary that the article be converted into a new and different article, having a distinctive name, character or use different from that of the original article (such would be the requirements to constitute an article a "manufacture"), but only that the article be so processed that it be removed from its crude or primary state, though it remain a variety of the original material. *United States* v. *C. J. Tower & Sons,* 44 C. C. P. A. (Customs) 1, C. A. D. 626. This rule is tempered, however, by the rule that an article will not be classified as "manufactured" by reason of its having been subjected to a manufacturing process designed solely to prepare the article for shipment, even though such preparation incidentally advances the article for its intended use. *Lackawanna Steel Co., et al.* v. *United States,* 10 Ct. Cust. Appls. 93, T. D. 38359.

The question as to whether merchandise such as is here involved was manufactured was considered by the predecessor of this court in customs jurisdiction in *Cone & Co. (Inc.)* v. *United States,* 14 Ct. Cust. Appls. 133, T. D. 41672.[1] In that case, the imported merchandise consisted of palmyra fiber which had been separated from the leaf in which it grew (by pounding and hackling, as was done in the instant case), sorted into bundles according to its natural length, and jumped and evened at one end by trimming. The court, in holding that the fiber was not manufactured, stated:

\* \* \* It can hardly be said, therefore, that they have been manufactured, in any way, since their extraction from the leaf. Nor are we of the opinion that the processes of extraction from the leaf can be said to be manufacturing processes. By a long and uniform line of decisions, the courts, including this court, have held that an operation, or operations, which simply cleanses or cleanse the material desired and frees or free it from impurities, so that it may be used as raw material in manufacturing processes is or are not a manufacturing process or processes. The underlying theory upon which these cases were decided is that well expressed by Wheeler, J., in *United States* v. *Godwin,* 91 Fed. 753, when he stated that if

---

[1] A portion of the merchandise in the *Cone* case was dutiable under the tariff act of 1913 and the remainder under the Tariff Act of 1922. The competition under the former act was between paragraphs 385 and 497 while paragraphs 1459 and 1582 were involved under the latter act. Paragraphs 385 and 1459 were the predecessors of paragraph 1558 of the Tariff Act of 1930, the latter being a substantial reenactment of the former two; paragraphs 497 and 1582 were the predecessors of paragraph 1684 of the Tariff Act of 1930, the latter being a substantial reenactment of the former two.

the processes applied to the material were no "other than to get it by itself," the material could not be said to be manufactured. * * *

Not only did Congress approve the decision in the *Cone* case by reenacting paragraphs 1459 and 1582 of the 1922 Act in substantially the same language in the Tariff Act of 1930, but this court, in *American Push Broom & Brush Co.* v. *United States*, 25 C. C. P. A. (Customs) 248, T. D. 49391, reaffirmed the decision in the *Cone* case. In that case palmyra stalks constituted the subject matter in controversy. The pre-importation treatment there consisted of removing the ribs from the palmyra leaves, sorting the ribs by natural lengths, gathering the sorted groups into bundles, and trimming the stalks at both ends. This court there held that the foregoing treatment did not render the stalks "manufactured."

We feel that, consistent with the *Tower, Lackawanna, Cone* and *American Push Broom* cases, *supra*, the here involved merchandise was "manufactured." In the light of the latter two cases, it is evident that the fiber and stalks were not manufactured up to and preceding the point at which the "trimming" operation was performed. (The drying operation, heretofore mentioned, was, in our opinion, performed solely for shipping purposes; the fiber and stalks would be subject to the risk of spoilage in the absence of such a precautionary measure.) The trimming operation, however, was not performed merely to "cleanse the material desired" and to free "it from impurities," or to "get it by itself," as stated in the *Cone* case. Nor was it performed solely to prepare the article for shipment, as in the *Lackawanna* case. Even in the absence of Smith's testimony, which clearly sets forth the fact that the fiber and stalks were trimmed to the *exact lengths* ordered, we are constrained to conclude that more was done to the merchandise than merely trimming for purposes of packing and shipping. How can we reconcile Demarest's statements to the effect that from 8 to 10 inches of the unusable portion of the stalks were trimmed off and that the fiber and stalks were trimmed to the approximate ordered lengths with appellant's contention that the trimming merely facilitated packing and shipping? How, also, can we reconcile this contention with the testimony of Werheim to the effect that the imported lengths of stalks were such that only ½ inch of stalk had to be trimmed at the final trimming step and that longer lengths would "stick out too far" and necessitate running them "too often through the trimmer"? Clearly, the trimming operation more than "incidentally" advanced this merchandise in condition for its intended use; the trimming step was obviously designed to bring the fiber and stalks one step closer to their final form and was clearly a manufacturing step. That the stalks and fiber were ordered from stock, assuming that appellant's statement is correct, can have no bearing on the outcome of this case when it clearly appears that the stock sizes

were the very sizes desired *and used* by the importers. Nor is it relevant that 5% of the fiber and stalks had to be discarded as unfit for use or that a subsequent trimming operation was necessary to equalize the lengths of the fiber and stalks after insertion into the broom and brush blocks. The final trimming operation would not have obviated the necessity for a preliminary "trimming" operation to reduce the fiber and stalks to the approximate lengths desired. Such preliminary trimming was essential to the proper and efficient production of brushes and brooms, as was indicated by Werheim. It would be a different case indeed if the trimming merely resulted in a bundle desirable for packing and shipping purposes and a subsequent trimming to desired length were performed in the United States prior to the insertion of the stalks and fiber into the blocks. In such a case this importation would fall squarely within the bounds of the *Lackawanna* case, *supra*, and would not be deemed manufactured.

That the *Cone* and *American Push Broom* cases, *supra*, are distinguishable from the instant case is clear. In the former case, only one end of the fiber was trimmed and there is no evidence in the court's opinion that the fiber was trimmed for purposes other than to facilitate packing or shipping.

In the latter case, the facts set forth in the opinion indicate that the palmyra stalks were trimmed at both ends prior to importation thereof, as are the instant stalks. It seems clear from the opinion, however, that no more trimming was done prior to importation than was necessary for shipping purposes, for, as the testimony of one of the witnesses, relating to post-importation processing, indicates:

* * * they are run through a combing machine to free all the fibers at the butt end. *The necessary trimming is done* and the ribs are repacked in bundles in which an equal number of butt ends have been stacked at top and bottom to produce a uniform package. In this condition they are used by the broom manufacturer. (Emphasis added.)

Thus, the trimming done prior to importation of the stalks in that case did not obviate the necessity for trimming the stalks down to usable lengths prior to insertion thereof in the broom blocks.

In our consideration of the here involved issue, we have not been unmindful of appellant's contentions that the record in the *American Push Broom* case indicates that "the merchandise was imported and sold in three lengths, namely, stalks of 16 inches in length, 22 inches in length and 29 inches in length" and that "the stalks had been cut or trimmed on both ends to the different lengths imported." It is obvious that, in view of the fact that the fiber and stalks, as removed from their natural environment, vary considerably in length, importers must give some indication in their orders for the merchandise of the length of fiber and stalks which they desire. Thus, if the stalks, for example, were extracted in natural lengths of approximately 10, 15

and 20 inches, no doubt the importers would be entitled to order said stalks in approximately those lengths without facing the possibility of an increase in duty assessment due to the performance of a manufacturing operation. And this would be so notwithstanding the fact that the stalks, *trimmed* on both ends for packing or shipping purposes, *incidentally* were reduced approximately to the ordered sizes. This is not to say, however, that the importer, desirous of obtaining 5, 12 and 16 inch lengths, may, with impunity, request that the stalks be trimmed from their natural lengths to the lengths desired. For compliance with such a request would not involve "trimming," primarily for packing or shipping purposes, but substantial cutting, *primarily* to satisfy an order and only *incidentally* for packing or shipping purposes. Such an operation would unquestionably remove the stalks from their crude state, advance them in condition towards their ultimate use, and thus render them manufactured.

As heretofore pointed out, the stalks in the *American Push Broom* case were trimmed subsequent to importation and prior to insertion thereof into the broom blocks. In view of the foregoing analysis, it seems evident that, though the stalks there were shipped to correspond to ordered lengths, they were trimmed primarily for shipping and packing purposes. If, in fact, the situation there were equivalent to that here involved, and yet the merchandise were nevertheless held dutiable as "not dressed or manufactured," we would be constrained to overrule the *American Push Broom* case. In view of what we have said, however, there is no necessity to so do.

For the foregoing reasons, we are of the opinion that the imported merchandise was properly classified as "articles manufactured, in whole or in part" under the provisions of paragraph 1558, as modified.

The judgment of the Customs Court is accordingly *affirmed.*

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.

---

WORLEY, Judge, concurring.

I agree with the conclusion reached by the majority for the sole reason that the trimming of the stalks to predetermined lengths to facilitate their use for a specific purpose was, under the facts here, a manufacturing step within the meaning of paragraph 1558. In view of that conclusion I doubt the necessity of determining whether the other treatments to which the stalks were subjected constituted a partial manufacture.