# United States Court of Appeals for the Federal Circuit

04-1019

WASHINGTON INTERNATIONAL INSURANCE COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Arthur K. Purcell, Sandler, Travis & Rosenberg, P.A., of New York, New York, argued for plaintiff-appellant. With him on the brief was Beth C. Ring.

Barbara S. Williams, Attorney in Charge, Commercial Litigation Branch, Civil Division, Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, of Washington, DC, and Aimee Lee, Attorney, of New York, New York. Of counsel on the brief was Chi S. Choy, Officer of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from:    United States Court of International Trade

Judge Thomas J. Aquilino, Jr.

# United States Court of Appeals for the Federal Circuit

04-1019

WASHINGTON INTERNATIONAL INSURANCE COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  January 18, 2005

_____

Before MAYER*, LOURIE and DYK, Circuit Judges.

MAYER, Circuit Judge.

Washington International Insurance Co. ("WIIC") appeals the judgment of the Court of International Trade, which affirmed the United States Customs Service's ("Customs") denial of WIIC's request for an exemption pursuant to subheading 806.30 of the Tariff Schedules of the United States ("TSUS")[1] for stainless steel sheets. Washington Int'l Ins. Co. v. United States, No. 92-04-00252 (Ct. Int'l Trade Aug. 8, 2003).  We affirm.

---

\* Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

[1] Subheading 806.30, TSUS, has since been replaced with subheading 9802.00.60 of the Harmonized Tariff Schedule of the United States.

<u>Background</u>

Subheading 806.30, TSUS, provides a duty exemption for:

> Any article of metal (except precious metal) <u>manufactured in the United States or subjected to a process of manufacture in the United States</u>, if exported for further processing, and if the exported article as processed outside the United States, or the article which results from the processing outside the United States, is returned to the United States for further processing.

(emphasis added). In order to benefit from this exemption, an importer must show that its product was manufactured or subject to a process of manufacture in the United States prior to any foreign processing.[2] If the importer is able to fulfill this condition, it is required to pay the duty only on the value of the foreign processing. For example, an importer of wrought iron rods may be entitled to the exemption if it can show that the iron ore used to make the bars was smelted in the United States and that, upon return to the United States, the rods will be used to make any of a variety of wrought iron products, such as beds, fences or railings. In such a case, the importer would be required to pay the duty only on the value added by the shaping of the iron blocks into rods, which would have occurred outside the United States.

The facts of this case are not disputed. Newmet Corporation and Newmet Steel Corporation (collectively "Newmet")[3] imported stainless steel sheets into the United States from 1984 to 1986. These stainless steel sheets were manufactured in foreign steel mills from stainless steel scrap that was exported from the United States. The stainless steel scrap, which both parties agree was not solely of domestic origin,

---

[2]    In order to qualify for the exemption, the import must undergo further processing once it reenters the United States.

[3]    WIIC was the surety on the customs bonds for Newmet's entries. As such, WIIC is the party in interest.

consisted of both obsolete and industrial scrap.[4] This scrap was purchased by Newmet and then processed in one of its scrap yards. According to WIIC, the scrap was subject to three processes in the scrap yard: (1) testing and segregating; (2) sizing; and (3) packaging. The scrap was tested and segregated in order to identify the character of the scrap and grouped according to its chemical composition. For example, the scrap may have been spark tested. The color of the spark caused by the contact of a grinding wheel and the scrap would identify the composition of the metal. A variety of other means may also have been used to test the scrap, such as acid, x-ray spectrometers and atomic absorption analyzers. Once the composition of the scrap was established, it was sorted accordingly. After the scrap was tested and sorted, it was sized to fit into the foreign steel mills. Sizing was accomplished by crushing, cutting, ripping, shearing and/or shredding. The scrap was subsequently packaged for export, which entailed first pressing it into briquettes or bales and then loading it into trucks or railcars. Finally, the scrap was shipped to foreign steel mills, which used the scrap to manufacture the stainless steel sheets that are the subject of this appeal.

When Newmet imported the stainless steel sheets, Customs assessed the duty on the sheets' full value. It refused to apply the subheading 806.30, TSUS, exemption because: (1) the scrap was not solely of domestic origin[5]; and (2) it did not consider the

---

[4] "Obsolete scrap" is metal machinery that is no longer usable, while "industrial scrap" is small pieces of metal waste that result from manufacturing various stainless steel products.

[5] If the scrap had originated in the United States (i.e., from obsolete stainless steel products manufactured in the United States or as waste from the manufacture of stainless steel products in the United States), the stainless steel sheets would be entitled to the exemption.

scrap to have been manufactured or subject to a process of manufacture in the United States prior to its exportation. WIIC agreed that the scrap did not originate solely in the United States; however, it argued that the scrap yard operations constitute a manufacturing process. In Headquarters Ruling Letter 555096, Customs denied WIIC's protest, maintaining that

> Customs does not consider processes such as the dismantling (by whatever means), shredding, crushing, ripping, and grinding of obsolete articles and industrial scrap to be manufacturing processes, whether or not accompanied by sorting, grading, or other similar activities to promote the stability or utility of the scrap. Manufacturing begins once raw materials are available, and does not include reclamation activities undertaken with respect to obsolete and industrial scrap prior to the creation of raw materials for new manufacturing.

WIIC appealed Customs' denial to the Court of International Trade. Before the trial court, WIIC argued that the scrap emerged from the scrap yards with a new name, character and use, and, therefore, that it had been manufactured or subject to a process of manufacturing. According to WIIC, the scrap that entered the scrap yards was "obsolete" or "industrial" scrap, while the scrap that resulted from the scrap yard operations was "prepared" or "commercial" scrap. WIIC also argued that the character of the scrap had changed in that it had become a new article of commerce suitable for use in the manufacture of stainless steel sheets. Finally, WIIC asserted that the use or purpose of the scrap had changed from simple waste to the precursor material of stainless steel sheets. The Court of International Trade affirmed Customs' denial, holding that "scraps of stainless steel entered the Newmet yard(s) and that scraps of stainless steel exited those premises." Washington Int'l, No. 92-04-00252, slip op. at 10-11. On appeal, WIIC makes the same argument as below that the scrap yard

operations imparted the scrap with a new name, character and use and, therefore, the imported sheets are entitled to the exemption pursuant to subheading 806.30, TSUS.

Discussion

We exercise jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). We review the judgment of the Court of International Trade that the scrap was not manufactured or subject to a process of manufacture de novo. See G&R Produce Co. v. United States, 381 F.3d 1328, 1331 (Fed. Cir. 2004); SL Serv., Inc. v. United States, 357 F.3d 1358, 1360 (Fed. Cir. 2004).

While the scrap used to make Newmet's stainless steel sheets was extensively manipulated, these manipulations merely cleaned, isolated or packaged the scrap. Such operations have not historically been considered processes of manufacture. A survey of precedent makes this clear. In Anheuser-Busch Brewing Associates v. United States, 207 U.S. 556 (1908), corks were extensively treated to prepare them for use in beverage containers. This treatment included examining and sorting the corks, branding the corks with the date and name of the beverage, cleaning the corks with a patented fan, washing, steaming and drying the corks, and, finally, bathing the corks in glycerin and alcohol. Id. at 559. Irrespective of the significant investment in the corks, the Supreme Court held that they had not been manufactured in the United States. Id. at 563. In so holding, the Court examined the meaning of "manufacture" and concluded that "[m]anufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary. . . . There must be transformation; a new and different article must emerge, having a distinctive name, character or use." Id. at 562 (internal

04-1019                                              5

quotation marks omitted).  Similarly, in Hartranft v. Wiegmann, 121 U.S. 609 (1887), the Court determined that shells that had been cleaned and then ground or polished using an emery wheel to expose the pearly interior were not manufactured.  In that case, the Court instructed that "[t]he application of labor to an article, either by hand or by mechanism, does not make the article necessarily a manufactured article, within the meaning of that term as used in the tariff laws."  Id. at 615.

Lackawanna Steel Co. v. United States, 10 Ct. Cust. 93 (1920), also addressed the distinction between articles that had been manipulated, even extensively, but not manufactured, and those that had been manufactured.  According to Lackawanna, an article is manufactured if the application of labor "is carried to such an extent that the article suffers a species of transformation and is changed into a new and different article, having a distinctive name, character, or use."  Id. at 97 (quoting Baumgarten v. Magone, 50 Fed. 69, 71 (C.C.N.Y. 1890)).  Cone & Co. v. United States, 14 Ct. Cust. 133 (1926), and Hampton, Jr. & Co. v. United States, 6 Ct. Cust. 392 (1915), are two examples of when the application of labor does not cause the type of conversion necessary to qualify as manufacturing.  Cone involved palmyra, which contains fibers that are used to make brooms and brushes.  In order to extract the fibers, the palmyra leaf is pounded and the fibers are combed free using a board embedded with nails.  14 Ct. Cust. at 135.  The fibers are then evened at one end and tied into bundles of similar lengths.  Id.  In holding that the fibers had not been manufactured, the court noted the well-established precedent that products that have been cleaned or freed of impurities so that they may be used as raw materials have not been manufactured, nor have the products been subject to a process of manufacture.  Id. at 136; see also Passaic

Worsted Co. v. United States, 17 C.C.P.A. 459, 461 (1930); United States v. Stone & Downer, 12 Ct. Cust. 293, 295 (1924). Hampton, 6 Ct. Cust. at 395, also shows that merely isolating a substance, as opposed to changing its "per se character," is not a manufacturing process. In Hampton, the court considered whether crushing and floating the mineral molybdenite in order to separate it from sulphur rendered the molybdenite manufactured. Id. at 393. It found that the treatment of the molybdenite was intended to get the mineral by itself, not to change its nature; therefore, it was not manufactured. Id. at 395.

The scrap in this case is akin to products that are simply isolated. While the scrap may have been extensively manipulated, the scrap yard operations simply separated stainless steel scrap and readied it for transport to and use in foreign steel mills. Cutting or washing away contaminants, in addition to the various means, both rudimentary and sophisticated, of determining the composition of the scrap, does not change the scrap any more than extracting minerals or harvesting and threshing grain. That scrap is waste, as opposed to a naturally occurring commodity, does not affect this conclusion. Its handling in the scrap yards still amounts to nothing more than reclamation. Thus, we agree with the Court of International Trade's assessment that "the substance of interest which entered the Newmet yard(s) remained that substance upon exit." Washington Int'l, No. 92-04-00252, slip op. at 8-9; see Anheuser-Busch, 207 U.S. at 562 ("A cork put through the claimant's process is still a cork."); Hartranft, 121 U.S. at 615 (holding that cleaned and polished shells retained their identity as shells).

It also cannot be said that the scrap yard operations constitute a "process of manufacture." Not every advancement or preparation of an article in anticipation of subsequent manufacture constitutes a "process of manufacture." If it did, the restriction in subheading 806.30, TSUS, would be superfluous. Under such a flawed use of the phrase, "process of manufacture" would apply to mining, drilling or transporting any raw material. Instead, "process of manufacture" is limited to one of the successive steps involved in transforming a product. For example, the melting of the stainless steel scrap in the foreign mills was a process of manufacture, though it did not, itself, complete the manufacture of stainless steel sheets. Similarly, the shaping of the melted steel into sheets was a process of manufacture. These are closely related steps that together, in addition to other processes of manufacture, transform a raw material into a final product. These processes are covered by subheading 806.30, TSUS, and do not involve the gathering, cleaning or preparation of raw materials.

Rossman v. United States, 1 Ct. Cust. 280 (1911), which WIIC relied on heavily, does not support a contrary conclusion. In that case, the court considered whether terrazzo, which is composed of marble chips and waste that is ground and used in flooring, was manufactured. Id. at 281. The tariff in question, which was contained in the Tariff Act of 1897, applied to "[m]inerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture." Id. (emphasis added). Thus, the statute specifically defined a process of manufacture as including refining or grinding. As such, crushing was held to be a process of manufacture as well. Id. at 283 ("If grinding be a process of manufacture we see no good reason for saying that crushing is not equally so."). This contextually defined use of "manufacture" does

not, however, have broader applicability. When used without modification, "manufacture" or "process of manufacture" cover a narrower range of commercial activities.

## Conclusion

Accordingly, the judgment of the Court of International Trade is affirmed.

## AFFIRMED