(C.D. 4127)

Crown Cork & Seal Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided November 18, 1970)

*Sullivan, Wiesand & Singer* (*Jan Guben* and *Robert L. Sullivan, Jr.*, of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Herbert P. Larsen* and *Steven P. Florsheim*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: This case was commenced by the filing of two protests covering twenty-seven separate entries. The legal question presented pertains to the classification, for customs duty purposes, of certain merchandise imported by the plaintiff from Portugal.

The merchandise, referred to on the invoices as "cork waste" has been characterized by plaintiff as "broken cork". It consists of irregular shaped cork particles of various sizes, but generally of one-half inch in the longest linear dimension. Samples of the cork were taken from each importation, and they were tested at the customs laboratory in Baltimore. The importations were classified either under item 220.10 or 220.15 of the Tariff Schedules of the United States as "cork, granulated or ground", depending upon the density in pounds per cubic foot uncompressed, as determined by the customs laboratory. Four entries were found to have a density under six pounds per cubic foot

uncompressed, and the appropriate portion of each was classified under item 220.10, at the rate of three cents per pound. The remaining twenty-three entries were classified under item 220.15, at one cent per pound, as weighing more than six pounds per cubic foot uncompressed.

Plaintiff contends that the cork, the subject of the importations, should have been classified under item 220.05 of the tariff schedules as "natural cork not manufactured", and therefore entitled to entry duty free. Alternatively, if classification is not made under item 220.05, plaintiff claims that the merchandise should be assessed at the rate of one cent per pound under item 220.15 as "cork, granulated or ground" weighing over six pounds per cubic foot uncompressed.

The items or provisions of the Tariff Schedules of the United States that are pertinent to this case may be set forth as follows:

Claimed under:

Schedule 2, part 2, subpart A:

"220.05    Natural cork not manufactured, and cork waste, shavings, and refuse of all kinds _____    Free"

Classified under:

Schedule 2, part 2, subpart A:

"Cork, granulated or ground:

| | | |
|---|---|---|
| 220.10 | Weighing not over 6 pounds per cubic foot uncompressed, except regranulated cork_____ | 3¢ per lb. |
| 220.15 | Other _____ | 1¢ per lb." |

At the outset, it must be noted that item 220.05 not only covers "[n]atural cork not manufactured", but also includes "cork waste, shavings, and refuse of all kinds". This is pertinent since the merchandise in issue was invoiced as "cork waste", and plaintiff, at a pre-trial conference, alleged that it was "in whole or in part cork waste." Although the record will show isolated conclusory statements by plaintiff's witnesses that plaintiff purchased "waste cork", no argument or discussion is contained in plaintiff's brief, submitted after trial, that the merchandise is "cork waste" within item 220.05 of the tariff schedules.

It is plaintiff's principal or "initial" claim that the merchandise was entitled to duty-free entry "as natural cork, not manufactured". Under these circumstances defendant urges that any claim that the merchandise is "cork waste" under item 220.05 "should be considered as abandoned." Defendant, nevertheless, has argued that the cork in question is not "cork waste", and that it has been properly classified as "cork, granulated or ground".

Plaintiff requested, and was granted, leave to submit a reply brief. The reply brief, however, contains no new matter, but does set forth a point heading which reads:

"The subject importations of cork consist of unmanufactured cork, either natural cork or cork waste, and are therefore entitled to duty-free entry."

Nevertheless, apart from a reference to a case cited in defendant's brief, plaintiff's reply brief contains no discussion pertaining to the legal principles that determine when merchandise is classifiable as "waste" for customs duty purposes. Plaintiff merely concludes that:

"It is the contention of the Plaintiff that the cork may be characterized as either natural cork or cork waste; the point being that it is certainly a non-manufactured article of cork not cork, manufactured, as defined in the subject tariff schedules and the cases construing the same." (Plaintiff's reply brief p. 10)

Defendant has called the attention of the court to the unrebutted testimony of one of defendant's witnesses that the cork, as imported, without further processing or alteration, can be and has been used as display material for the floors of retail store windows, and as protective filler in the packaging of delicate instruments. Defendant also notes that the grinding, cleaning and drying processes performed on the cork by the plaintiff in its Lisbon plant, prior to its exportation to the United States, surely take the merchandise out of the classification of "waste". In defendant's view, the imported cork has been (remanufactured or at least partially remanufactured", thereby precluding any customs classification as "waste". See *Supreme Tire and Rubber Co.* v. *United States*, 7 Cust. Ct. 193, C.D. 566 (1941); *United States* v. *David Studner et al.*, 57 CCPA 122, C.A.D. 990 (1970).

The meager and unsatisfactory testimony given at the trial by plaintiff's witnesses may very well explain plaintiff's failure to argue in its briefs that the imported merchandise was "cork waste". On the question whether the merchandise in issue constituted "waste", in the legal sense of the word, the proof at the trial was insufficient and unsatisfactory. See authorities cited in *Cheltenham Supply Corp.* v. *United States*, 63 Cust. Ct. 271, C.D. 3908, 306 F. Supp. 472 (1969). Consequently, it is the determination of the court that any claim that the merchandise is "cork waste" is either deemed to have been abandoned, or without merit, and therefore overruled.

The question presented, therefore, is whether the imported merchandise is "natural cork not manufactured", as claimed by plaintiff, or "cork, granulated or ground", as classified by the customs officials. It is agreed that if the court were to find that the merchandise was properly classified as "cork, granulated or ground", it would then be necessary to decide plaintiff's alternative contention that all of the cork in the im-

portations was dutiable at the rate of one cent per pound because of its claim that it weighed over six pounds per cubic foot uncompressed.

At the trial, plaintiff introduced detailed testimony to describe the various processes to which the cork in question was subjected prior to its exportation to the United States. After the cork is split from the trees with knives, it is taken to tanneries where it is softened by steaming. This is accomplished by subjecting the cork to heat and moisture. After it is softened at the tannery the bark and hardback are scraped from the cork, and it is then flattened. In response to the question why the bark is removed, plaintiff's first witness responded:

> "Because the outer bark of the bark itself contains dirt and hard particles, and these hard particles are not compressible, they don't have the properties that are required to give you the end product that is later needed for whatever purpose it is intended."

After being flattened, the cork is acquired by companies, such as manufacturers of wine bottle stoppers. After the stoppers have been punched out of the cork, the remainder is purchased by the plaintiff. Plaintiff also purchases cork from other sources, such as manufacturers of cork shoe soles, cork for fish nets, and cork for the insulation of walls.

Plaintiff receives the cork in its plant in Lisbon, Portugal, where the cork is first reduced in size to particles of approximately one-half inch. This is accomplished by an operation or process called "breaking", by the use of a "bale breaker" with swinging hammers and a grate bar at the bottom. It was explained that "the swinging hammers hit a striking bar, and the cork, and they in turn cut it or reduce it in size and at the same time, by using a swinging hammer mill you continually are bouncing off of this cork and loosening the hardback and the bark from it, and this then does a better job of cleaning the cork than with a different type of mill." The loosened hardback and bark "* * * will go through the bottom screen and off as scrap."

After the cork has been reduced in size or broken as described, it "is passed through driers to normally lower the moisture." The cork is finally compressed and packed or packaged into bales. According to the testimony of plaintiff's witnesses, upon arrival in the United States the imported cork is put through numerous manufacturing processes to produce the end product, i.e., cork discs used as bottle cap liners, crown bottle caps or cork gaskets.

In view of the foregoing processes to which the cork is subjected prior to importation, i.e., "softening, scraping off bark and hardback, flattening, reducing particle size to approximately ½ inches, cleaning and drying", it is defendant's contention that "these processes are manufacturing processes, and when considered in a continuum,

result in manufactured or partially manufactured merchandise." (Defendant's brief, p. 11) Defendant consequently maintains that the cork in issue is not classifiable as "natural cork not manufactured".

Plaintiff, on the other hand, asserts that "[t]he only process through which the cork is put in Portugal, is a breaking process which merely reduces the size of the cork to between one-half inch (½″) and five-eights of an inch (⅝″), in order for it to be more conveniently baled, stored, and shipped to the United States." (Plaintiff's brief, p. 12)

Plaintiff's major claim is founded upon the assertions of fact that "all items of work performed on subject cork in Portugal were for no purpose other than the facilitation of its transportation to the United States", and consisted "almost exclusively of breaking the cork into suitable size and shape for transportation", and "in no way aided its ultimate manufacture in the United States." (Plaintiff's brief, pp. 15–16)

The assertions of the plaintiff are not supported by the record, and the cases cited in its brief reveal that the merchandise at bar was properly classified as "cork, granulated or ground". After stating that the applicable law has been well reasoned and established for a long period of time, plaintiff cites and quotes from the case of *United States* v. *C. J. Tower & Sons*, 44 CCPA 1, C.A.D. 626 (1956). Plaintiff, however, is in error in its belief that the appellate court therein ultimately held for the plaintiff. Plaintiff asserts that the imported limestone slabs, in the *C. J. Tower & Sons* case, "had been cut in order to facilitate transportation" and erroneously states that the court agreed with plaintiff's contention that the slabs "were still unmanufactured."

In the *C. J. Tower & Sons* case the merchandise consisted of limestone slabs suitable for use as monumental or building stone, and was classified by the collector of customs as "hewn, dressed, or polished, or *otherwise manufactured*" under the Tariff Act of 1930, as modified. [Emphasis added.] Plaintiff therein claimed that the limestone slabs were properly classifiable as "unmanufactured, or not dressed, hewn, or polished", and hence dutiable at a considerably lower rate of duty. In the words of the Court of Customs and Patent Appeals the issue in that case "is simply * * * whether, as the Government contends, the limestone slabs are 'hewn, dressed, or polished, or otherwise manufactured,' or, as is claimed by the importer, they are 'unmanufactured, or not dressed, hewn, or polished'."

Although the United States Customs Court sustained the protest on behalf of the importer, the appellate court reversed, noting that "it is not at all apparent that the slabs here involved were sawn *solely* to facilitate transportation." [Emphasis in original.] 44 CCPA at 8. The appellate court consequently held that "the limestone slabs at bar have been 'otherwise manufactured'."

In distinguishing several cases dealing with varying tariff provisions, the Court of Customs and Patent Appeals said:

> "For it is now thoroughly established that a provision for a named material 'manufactured' and one for 'manufactures' of that material have different tariff meanings. *United States* v. *Nippon Co. et al.*, 32 C.C.P.A. (Customs) 164, CAD 303. While to constitute an article a manufacture, it may be necessary to convert the article into an entirely different article, it is only necessary that the article be so processed that it be removed from its crude or primary state, though it remain a variety of the original material, to be manufactured." 44 CCPA at 7.

Citing the case of *Lackawanna Steel Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 93, T.D. 38359 (1920), the court went on to say:

> "This rule is tempered, however, by the rule that an article will not be excluded from classification as 'unmanufactured' by reason of its having been subjected to a manufacturing process designed solely to prepare the article for shipment, even though such preparation incidentally advances the article for its intended use." *Ibid.*

In the *C. J. Tower & Sons case*, the court distinguished the *Lackawanna Steel Co.* case where the merchandise consisted of limestone crushed to facilitate transportation. The court quoted the following from the *Lackawanna Steel Co.* case:

> "While the crushing at the quarry may necessarily have facilitated the crushing at the point of ultimate use, by rendering larger or more powerful crushing machinery unnecessary, upon the facts of this record it cannot be said that the former was done as a manufacturing process for any particular use, or for any such purpose whatsoever.
>
> \*    \*    \*    \*    \*    \*    \*
>
> "* * * this record incontrovertably showing that this crushing was done solely to facilitate transportation, * * * the court is not prepared to deny importers this right because perchance it may also benefit the ultimate consumer. * * *
>
> "* * * These importations however, are not * * * ready for ultimate use. On the contrary, they must undergo several processes, *including* a preliminary one of crushing, before they are made ready for ultimate use. [Emphasis in *Lackawanna Steel Co.* v. *United States*] The record clearly establishes that the crushing at the quarries for the purposes of transportation *does not supersede and render unnecessary crushing at the destination and for final use. * * *"* [Emphasis in *C. J. Tower & Sons* v. *United States.*] 44 CCPA at 7.

The court in the *C. J. Tower & Sons* case observed:

> "Thus, it is clear that, in the *Lackawanna* case, the influencing and controlling factor was that the processes to which the imported stone were subjected included an *additional crushing* operation, whereas the sawing operation in the case at bar ob-

viated the need for any like operation by the importer." [Emphasis in original.] 44 CCPA at 7–8.

What was said by the court in the *C. J. Tower & Sons* case of the limestone slabs there, can be said of the cork in the case at bar. Indeed, it would seem clear that the various processes to which the cork were put were not designed "solely to facilitate transportation".

A case that has received extensive treatment by both parties is *Gudewill & Bucknall* v. *United States, etc.*, 142 F. 214 (1904), decided by the Circuit Court for the Southern District of New York. The case arose on application for review of two decisions of the Board of United States General Appraisers. 7 Treas. Dec. 869, G.A. 5692 (T.D. 25334) (1904). The Board's decisions under review had affirmed the assessment of duty by the collector of customs on certain small pieces of cork produced by grinding the refuse obtained in trimming cork bark in the process of fitting it for baling. The decision of the Board states that the testimony revealed that the merchandise "is the refuse from cork bark put into a mill and ground".

The question before the Board was whether the cork, "averaging a little larger in size than an ordinary grain of corn", was "a manufacture of cork" or "cork wood or cork bark, unmanufactured". After a discussion of the evidence and some cases, the Board affirmed the action of the collector in classifying the cork as "a manufacture of cork", and stated:

"While the case at bar presents what we conceive to be a close question, * * * we must reach the conclusion that the commodity is not cork unmanufactured. The evident intention of the process by which it was brought into its present condition was to produce the exact article before us. It is not the offal or by-product incidentally resulting from the intentional manufacture of some other commodity." 7 Treas. Dec. at 870.

Before the Circuit Court, the importers apparently contended that the cork should have been classified as waste. The Circuit Court reversed with only the conclusory statement "[t]he decision of the Board of General Appraisers is reversed." It is only from the Reporter's headnote that one learns that the "ground cork refuse", was held "to be dutiable as waste, * * * and not as a manufacture of cork". Surely little weight may be attached to such a decision as precedent. No reason is given for the reversal, and for all that appears, the defendant may be correct in its assertion that "the court held that merchandise which was unquestionably waste cork, and which had merely been subjected to a grinding process prior to importation, was classifiable as waste cork rather than a manufacture of cork."

The Tariff Act of 1897 did not have a provision such as is found in the tariff schedules dealing with "cork, granulated or ground". The provision of law applicable to the *Gudewill & Bucknall* case spoke

of a "manufacture of cork", and, as indicated previously, such language has a particular meaning in tariff legislation. Regardless of any legal justification for the Circuit Court's reversal of the Board's decision in that case, suffice it to say that it is also clearly distinguishable on the facts since the cork therein had undergone a single grinding process whereas the cork at bar has been subjected to several additional processes such as softening, scraping off bark and hardback, reducing the size, cleaning and drying. See decision of the Board in G.A. 5692 (T.D. 25334) (1904).

There are many reported cases that shed considerable light upon the legal issues pertaining to the proper classification of the imported cork at bar.

In *Samuel Shapiro & Co., Inc.* v. *United States*, 20 Cust. Ct. 41, C.D. 1081 (1948), this court had to determine the proper tariff classification of an importation of natural cork in sheets measuring 4 inches by 12 inches, and of thickness of ½, 1, 2, and 3 millimeters. The cork had been classified under the Tariff Act of 1930 as "manufactures wholly or in chief value of cork bark or cork, not specially provided for * * *" with duty at the rate of 45 per centum ad valorem. The evidence established that the cork was ordered in the particular dimensions "as it is a convenient size to handle, shape, and sell." Although five claims were made, plaintiff chiefly relied upon free entry under the provision of the act for "cork wood, or cork bark, unmanufactured." The court, citing the case of *United States* v. *Nippon Co. et al.*, 32 CPA 164, C.A.D. 303 (1945), set forth the distinction between the tariff words "manufactures of", followed by the name of a material, and, the name of the material, followed by the word "manufactured". The court said that the distinction between the two has been well-settled, "in that the former implies the completion of a new article of commerce, distinct from the material of which it was made, while the latter contemplates the advancement of a material which, however, still retains its identity as that material." 20 Cust. Ct. at 43.

The court thereupon stated:

"Applying this test to the merchandise at bar, we find that while the sheets of cork here in question have been advanced from the state in which the cork was originally taken from the tree, they have not been made into new articles or things, but merely consist of cork processed or manufactured into a convenient form as a material from which various articles might be made. It is, therefore, clear that the collector's classification of the same under the provision for 'manufactures wholly or in chief value of cork bark or cork' was incorrect. It is equally clear, however, that the plaintiff's claim for free entry under the provision for 'Cork wood, or cork bark, unmanufactured' is untenable, for the record establishes that the merchandise at bar is cork wood or cork bark which has been subjected to manufacturing effort which advanced

. . . it from the condition in which it was taken from the tree and brought it to the condition whereby it was suitable as a cork material for further manufacture into its ultimate use. These efforts went beyond the mere getting of the cork by itself. Rather than being cork wood or cork bark, unmanufactured, it is at once apparent from an inspection of the exhibits of the imported merchandise before the court that it is cork wood or cork bark, manufactured." *Ibid.*

Since there was no provision in the Tariff Act of 1930 for cork wood or cork bark, manufactured, nor was there any enumeration that would have covered the cork therein, the court classified the merchandise under a provision by similitude for "* * * cork, commonly or commercially known as artificial composition, or compressed cork, in the rough and not further advanced than slabs, blocks, planks, rods, sticks, or similar forms" with duty at 10 cents per pound.

In the case at bar, since item 220.05 of the tariff schedules deals with a named material, i.e., "natural cork" followed by the words "not manufactured", the statements of the court in the *Samuel Shapiro & Co., Inc.* case, pertaining to the advancement of the material, are particularly pertinent. Notwithstanding plaintiff's repeated disavowals, there is no doubt that by moistening, removing the bark, breaking, cleaning, and drying, the cork in question has been substantially advanced from its natural state.

Whether merchandise has been subjected to a manufacturing process is a question that has been thoroughly explored by the courts. In *L. A. Salomon & Bro.* v. *United States*, 1 Cust. Ct. 293, C.D. 68 (1938), the question presented pertained to the proper classification of ground silica. The merchandise, silica, is of volcanic origin occurring in natural deposits in the Island of Milos, Greece. After mining, the silica is ground and placed in bags for shipment. The court stated that, "[f]rom the evidence it is clear that the merchandise imported herein is in fact silica reduced by manufacture to a powdered form." Although the case held that, under the tariff provisions there applicable, the ground silica was entitled to free entry under the *eo nomine* provision for silica, there is no doubt that the court regarded the grinding process to be a "manufacturing process". Were the question, in the *L. A. Salomon & Bro.* case, to have been whether the silica had been "silica not manufactured", the following statements of the court clearly indicate that the answer would have been in the negative:

"The provision for 'silica * * * not specially provided for,' includes within its terms silica in any form not otherwise provided for in the act. As crude silica is specially provided for in paragraph 207, the only possble form of silica to be included in paragraph 1775 is silica in a manufactured state. The grinding of the silica here is unquestionably a manufacturing process * * *." 1 Cust. Ct. at 296.

Another case, equally germane to the inquiry as to what constitutes a manufacturing process, is the case of *C. S. Emery & Co.* v. *United States*, 15 Cust. Ct. 22, C.D. 934 (1945). *The C. S. Emery & Co.* case pertained to the classification of two types of merchandise. The first was alfalfa hay that had been chopped or cut into very small pieces, and was described as "coarse alfalfa meal", "ground alfalfa hay", and "chopped alfalfa hay". The second was alfalfa hay which had been ground or pulverized into meal and was 20 per centum dehydrated. The collector classified the merchandise as a nonenumerated manufactured article at the rate of 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930. Plaintiff claimed that the merchandise was properly dutiable under paragraph 779 of that act, which specifically covered "hay", or, alternatively, at 10 per centum ad valorem as a nonenumerated unmanufactured article under paragraph 1558.

Since the first type of merchandise was still recognizable as hay, the court held that it was properly dutiable under the *eo nomine* provision for "hay" under paragraph 779. As for the second type of merchandise the court held that it was no longer "hay" as commonly understood and said:

> "The next question is whether the merchandise is dutiable as a nonenumerated manufactured or a nonenumerated unmanufactured article."

In sustaining the classification of the collector, and holding that this second type of merchandise was a nonenumerated *manufactured* article, the court stated:

> "In the instant case the original article was grass or hay; the article under consideration is dehydrated meal. It has attained a distinctive name and use—alfalfa meal, used as an ingredient for chicken feed. In *Stone & Co.* v. *United States* [7 Ct. Cust. Appls. 173, T.D. 36492 (1916)], the court said that grinding and crushing have been held processes of manufacture. In *P. E. Anderson & Co.* v. *United States*, 50 Treas. Dec. 678, Abstract 705 [1926], it was held that moss, ground by a milling process and imported in powder form, was classifiable as 'moss * * * if manufactured * * *' and not as 'moss * * * crude or unmanufactured * * *.' In the instant case, besides being ground, the merchandise has been dehydrated.
>
> "We hold therefore that the commodity exemplified by plaintiff's exhibit 2 is dutiable as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930." 15 Cust. Ct. at 25.

The judicial precedents examined, on what constitutes a manufacturing process, inescapably lead to the conclusion that the cork in the case at bar is not "cork not manufactured". Plaintiff's contention

that the "only process through which the cork is put in Portugal, is a breaking process * * * in order for it to be more conveniently baled, stored, and shipped to the United States" is obviously inaccurate. (Plaintiff's brief, p. 12) Consequently, the legal criterion, which constitutes a manufacturing process, cannot be "tempered" by the rule enunciated in the *Lackawanna Steel Co.* case where an article is subjected to a manufacturing process designed *solely* to prepare it for shipment. Only in such a situation will a manufacturing process not exclude an article from a classification as "unmanufactured". This is true even though the preparation, solely for shipment, *incidentally* advances the article for its intended use.

In the case at bar, even if it were possible to hold that the "breaking" process was designed solely to facilitate transportation, one could not ignore the other additional processes. Furthermore, the record would not permit a finding that the advancement of the article was the result solely of the "breaking" process, or that it was incidental. Notwithstanding the subsequent processes undertaken in the United States in order to manufacture the crown bottle caps or cork gaskets, which constitute plaintiff's end product, there is no doubt that at least some of the processes performed at the Lisbon plant also were designed to advance the article for its intended use.

The case of *Stone & Co.* v. *United States*, 7 Ct. Cust. Appls. 173, T.D. 36492 (1916), which involved currants which had been ground to a pulp, cited a large number of cases, including two of the Supreme Court of the United States, for the statements that:

> "Either grinding or crushing have been held to be a process of manufacture. Nor is a change of name essential, nor need the article be in the condition as imported ready for its ultimate use." 7 Ct. Cust. Appls. at 173.

The tariff items, pertinent to the case at bar, show clearly the legislative distinction between one classification for cork "not manufactured", and another for cork that is or has been "granulated or ground". It is therefore quite impossible to mistake the legislative intent that either the process of granulating or grinding removes the cork from the category of cork that is "not manufactured". Consequently, cork that has been "granulated", or "ground" must be classified under the appropriate item covering such cork, and cannot be classified as cork "not manufactured". Were the court to decide otherwise, it would not merely ignore the legislative intent, but would, in effect, repeal the provisions pertaining to cork that has been granulated or ground.

It is to be noted that plaintiff has characterized the cork in issue as "broken cork" or "cut cork," and it may be asked whether such cork

may be deemed to be "granulated" or "ground". There is abundant judicial authority for the proposition that "grinding" or "refining" is "a process of manufacture". See *Stone & Co.* v. *United States*, 7 Ct. Cust. Appls. 173–174, T.D. 36492 (1916), and cases cited therein. See also *Rossman* v. *United States*, 1 Ct. Cust. Appls. 280, 283, T.D. 31321 (1911). In the *Rossman* case, the court held that the merchandise consisting of marble chips that had been crushed and screened was dutiable as "an article manufactured, in whole or in part." The plaintiff, on the other hand, had claimed that the merchandise was entitled to free entry under a provision of the Tariff Act of 1897 that covered "minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture * * *." Since the marble chips had been "crushed", rather than "ground", the court observed:

> "If grinding be a process of manufacture we see no good reason for saying that crushing is not equally so. The operations are similar, the main difference being that in grinding the substance treated is more finely pulverized than is ordinarily understood to result from the crushing process. It is rather a difference of degree than otherwise." 1 Ct. Cust. Appls. at 283.

The specific question whether merchandise was "ground" or "unground" was presented in the case of *United States* v. *Colonial Commerce Co., Ltd., et al.*, 44 CCPA 18, C.A.D. 629 (1956). In that case, the government appealed from a judgment of the United States Customs Court which sustained the importers' protest and held that the merchandise should have been classified as unground sage rather than ground sage. The applicable provision of the Tariff Act of 1930 read as follows:

> "Spices and spice seeds: * * * sage, unground, 1 cent per pound; ground, 3 cents per pound; * * *."

After a consideration of various lexicographic definitions of "grinding" and the case of *Frame & Co.* v. *United States*, 9 Treas. Dec. 866, T.D. 26374, G.A. 6045 (1905), aff'd 143 Fed. 692 (1906), the Court of Customs and Patent Appeals stated:

> "* * * although grinding is necessarily a physical process involving the application of friction, or crushing, to the material at hand, the term is broad enough to cover a variety of processes by which materials are divided into relatively small particles." 44 CCPA at 20.

The court added that:

> "It is true that the definitions of grinding contemplate a reduction to small particles *or* to powder, but no definition has been cited, and we have found none, which gives actual limiting dimensions of the particles or powder included in the definition of the word 'grind' or 'ground.' It is obvious, however, that the

term may be applied to particles of various sizes since it is common, as in the case of coffee, for example, to speak of coarse and fine grinding." [Emphasis in original.] 44 CCPA at 21.

The court also stated that, in its opinion, the merchandise therein would have been considered to be "ground" sage by persons in the spice trade. The court, consequently, concluded that the merchandise had been properly classified by the collector of customs as "ground sage", and reversed the decision of the United States Customs Court.

The statements of the court in the *Rossman* and *Colonial Commerce Co.* cases, are particularly applicable to the cork particles in the case at bar.

From all of the cases examined at least two conclusions may be drawn: first, that grinding is a manufacturing process, and second, that it consists of a reduction of a material to small particles. Since the word "grinding" "is broad enough to cover a variety of processes by which materials are divided into relatively small particles", it includes breaking, crushing, cutting or pulverizing. It may also be noted that *Webster's Third New International Dictionary, Unabridged* (1968), defines a "granule" as "one of a number of particles forming a larger unit".

Upon consideration of the record, which reveals the various processes performed upon the cork in issue, and the pertinent authorities, the court finds that the merchandise in issue is not "natural cork not manufactured" as claimed by the plaintiff. It is the determination of the court that the merchandise was properly classified as "cork, granulated or ground", under schedule 2, part 2, subpart A of the Tariff Schedules of the United States.

Having determined that the merchandise was properly classified as "cork, granulated or ground", the court will proceed to consider plaintiff's alternative claim that the cork from all of the entries should have been classified under item 220.15, with duty at one cent per pound. This claim is based upon plaintiff's contention that the four entries that were found by the customs laboratory to weigh "not over 6 pounds per cubic foot uncompressed", and hence dutiable under item 220.10 at the rate of three cents per pound, were improperly classified. Plaintiff maintains that the cork from all of the entries weighed over six pounds per cubic foot uncompressed.

The purpose of the six-pound weight distinction in item 220.10 is to differentiate higher grade granulated cork from the lower grade variety. The legislative history of the item was considered by this court in the case of *Consolidated Corp.* v. *United States*, 63 Cust. Ct. 234, C.D. 3902 (1969), appeal pending. In that case the plaintiff was a manufacturer of bottle caps of crown cork, and the issue was whether

the imported granulated cork therein weighed over or under six pounds per cubic foot uncompressed.

On the question of the weight of the cork, Judge Maletz, writing for the court, noted:

> "The lighter-weight material is milled cork of high quality that has been cleaned and screened and is suitable for the manufacture of beverage seals and other products which require the complete elimination of hardback, dirt, and other extraneous matter. This high-grade cork invariably weighs *not more than* 6 pounds per cubic foot uncompressed. The heavier-weight material is low-grade cork that contains hardback and impurities and is used principally as a fill for insulation purposes; such low-grade cork invariably weighs *more than* 6 pounds per cubic foot." [Emphasis in original.] 63 Cust. Ct. at 239.

Defendant, in the case at bar, called as a witness the assistant chief chemist at the Baltimore customs laboratory who testified that he devised a procedure to determine the density of the merchandise since there were no written guidelines or procedures to do so. It may be noted that the qualification of this witness to devise a testing procedure was not questioned by the plaintiff. The witness who was personally involved in all of the laboratory testing of the cork entries, by having either conducted or supervised all of the tests, explained in considerable detail the procedure and all of its various steps or phases.

To summarize, a bale of cork from a particular entry was opened and the cork was allowed to decompress a minimum of 48 hours. Large kettles of known capacities, in excess of one cubic foot, were filled to capacity after being shaken, so that the cork would settle as compactly as possible. The number of pounds per cubic foot were determined for each entry by weighing the container before and after it was filled with cork.

The witness also testified that in order to reduce error to a minimum, large measuring vessels were used and the amounts of cork taken from the subject entries were large. When the results obtained were near the six-pound-per-cubic-foot break-even point, the test was repeated two to five times and the results were averaged.

In an effort to refute the results of the procedure utilized by the customs laboratory, plaintiff called upon an associate professor of physics who used different methods to determine the density of the cork. This witness testified that the procedure used by the customs laboratory was inaccurate. This testimony, however, is not as significant as plaintiff seems to believe since both experts agreed that a completely accurate determination of the density of the cork is impossible to obtain. Although plaintiff's expert used different methods to determine the density of the cork, it cannot be said that they were better or superior

to the method devised at the customs laboratory. All that can be said is that each witness found some fault with the various procedures used by the other. The more serious criticisms would seem to be those mentioned by the government's witness concerning the testing procedure used by plaintiff's expert. It may also be added that the samples upon which plaintiff's expert performed his density tests were not obtained from any specified entry.

Surely this record does not justify a finding that the method devised by the customs laboratory was not a reasonable one, or that it was not designed to give reasonably accurate results. Upon all of the facts presented on the question of the density or weight per cubic foot uncompressed of the cork in issue, the court must find that the plaintiff has not borne its burden of proof to sustain its claimed alternative classification. Hence, it is the determination of the court that all of the entries in the protests at bar were properly classified either under item 220.10 or item 220.15 of the Tariff Schedules of the United States.

For the foregoing reasons, the protests are overruled. Judgment will issue accordingly.