**INTERNATIONAL COMPONENTS CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 79–12–01796.**

United States Court of International Trade.

Aug. 25, 1987.

Mandel & Grunfeld, Steven P. Florsheim, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in charge, Intern. Trade Field Office, Com-

mercial Litigation Branch, Paula N. Rubin, New York City, for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Japan, and described on the customs invoices as "fractional horsepower direct current permanent magnet motors."

The merchandise was classified by the Customs Service as motors "of under $\frac{1}{40}$ horsepower," under item 682.25 of the Tariff Schedules of the United States (TSUS). Consequently, it was assessed with duty of 12.5 per centum ad valorem.

Plaintiff protests this classification, and contends that the imported merchandise is properly classifiable under item 682.30, TSUS, as motors "of $\frac{1}{40}$ or more but not over $\frac{1}{10}$ horsepower," dutiable at a rate of 6 per centum ad valorem.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified Under:

Schedule 6, Part 5:

Generators, motors, motor-generators, converters (rotary or static), transformers, rectifiers and rectifying apparatus, and inductors; all the foregoing which are electrical goods, and parts thereof:

Motors:

Of under 1/40 horsepower:

. . .

682.25    Other....................12.5% ad valorem

Claimed Under:

682.30    Of 1/40 or more but not over
          1/10 horsepower .........  6% ad valorem
                            (modified by TD 68-9)

The question presented is whether, within the meaning of the competing tariff provisions, the imported merchandise is dutiable as "Motors Of under $\frac{1}{40}$ horsepower," as classified by Customs, or as "Motors: Of $\frac{1}{40}$ or more but not over $\frac{1}{10}$ horsepower," as claimed by plaintiff. In order to decide this issue, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed. Cir.1984).

After an examination of the merchandise, the exhibits, the testimony of record, and the relevant case law, it is the determination of the court that plaintiff has not overcome the presumption of correctness that attaches to the government's classification, and that the imported merchandise was classified correctly. *See* 28 U.S.C. § 2639(a)(1) (1982); *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984); *E.R. Hawthorne & Co. v. United States*, 730 F.2d 1490, 1490 (Fed.Cir.1984).

The imported merchandise consists of small electrical motors which are capable of producing fractions of a horsepower. These motors are used in appliances such as hairdryers, cookie guns, rechargeable grass shears, tape drivers, and emergency flashing lights.

To redress a lack of uniformity in the testing of fractional horsepower electric motors and to ascertain the capable horsepower of each motor, Customs developed a uniform test based on maximum output. The test requires that, for fractional horsepower motors in the class of less than $\frac{1}{20}$ horsepower, the horsepower shall be the maximum output horsepower the motor will produce for a period of 5 minutes during which the temperature of the motor does not increase to a value which causes permanent injury to the motor.

The implementation of this test by Customs involves a two-step procedure. First, there is a screening test in which the motor is coupled to a dynamometer which applies the requisite degree of torque to the motor, and measures its speed in revolutions per minute (RPM). During this screening test, Customs starts the motor at a very low voltage and torque, and gradually increases the levels until the motor achieves $\frac{1}{40}$ horsepower of output. If the motor does not reach $\frac{1}{40}$, or is damaged in the attempt, it is classified as a motor under $\frac{1}{40}$ horsepower, under item 682.25, TSUS. If the motor reaches $\frac{1}{40}$ horsepower during the screening test, it is stopped and allowed to cool. The motor is then subjected to a second procedure, a 5-minute test using the torque and voltage levels calculated to

allow the motor to reach $\frac{1}{40}$ horsepower during the screening test.

Plaintiff does not challenge the maximum output test as a whole, but, rather, alleges that the two-step procedure used in implementing the test was inadequate, and produced erroneous results. Specifically, plaintiff alleges that Customs did not test samples from its shipment, that tests of identical motor models produced inconsistent and inaccurate results, and that Customs' methods and training techniques were insufficient and imprecise.

At trial, plaintiff called two witnesses familiar with the testing of fractional horsepower electric motors. Mr. James L. Gaza, president of plaintiff corporation, testified that he tested and supervised the testing of the imported Igarashi motors, using the method developed by Customs with minor, but critical, variations. He asserted that, in all instances, the nine motor models in issue were capable of producing $\frac{1}{40}$ horsepower or more.

In discussing his departures from Customs' procedures, Mr. Gaza stressed the importance of proper alignment between the shaft of the motor and the dynamometer. He testified that excess torque on the motors created by any misalignment would decrease their horsepower capability. To insure precise alignment between the motor and the dynamometer, Mr. Gaza used an ammeter. This device measures the voltage input necessary to make the motor spin. Mr. Gaza explained that he would measure the voltage input before and after coupling to the dynamometer. If the voltage varied by more than 1 or 2 percent, he would know that proper alignment had not been achieved, and would repeat the process.

Mr. Gaza criticized the "Lord" coupling device which was used by Customs to connect the shaft of the motor to the shaft of the dynamometer. He recommended a flexible coupling, such as the coupling manufactured by Igarashi, to compensate for any misalignment. Mr. Gaza also criticized the screening procedure used by Customs, and stated that customers for the motors were concerned with the lifespan of the motor at a given voltage, and not with its horsepower capability.

Mr. Gaza stated that the motors have a manufacturing tolerance of plus or minus 10 percent which would make the voltage necessary to produce $\frac{1}{40}$ horsepower vary from motor to motor. However, he denied that this would result in different horsepower capabilities among motors. Instead, he claimed that, in determining voltage and torque levels to be applied in the screening test, Customs should incorporate the manufacturing tolerances into their calculations by measuring voltage and torque parameters based on one-half of the motor's loadpoint. He added that the procedure used by Customs of gradually increasing torque and voltage levels until $\frac{1}{40}$ horsepower was reached could damage the motor by causing it to stall.

In support of its argument, plaintiff introduced into evidence certain exhibits consisting of customs laboratory reports of tests performed on the motor models in question. These reports showed that various laboratories had achieved different results in classifying these motors according to their horsepower rating. Specifically, plaintiff points to two situations in which motors that were originally classified as incapable of reaching $\frac{1}{40}$ horsepower were found to be capable of reaching over $\frac{1}{40}$ horsepower upon retesting. Mr. Gaza opined that if voltage was varied to compensate for manufacturing tolerance, all of the motors would be capable of producing $\frac{1}{40}$ horsepower or more, and that the inconsistent results were caused by the erroneous procedures of Customs, and not by variance among the sample motors. Moreover, he claimed that, to produce proper results from this test, a minimum of 10 samples were necessary.

Plaintiff's second witness, Mr. Christian C. Peterson, an employee of Polaroid Corporation and a user of fractional horsepower motors manufactured by Igarashi, testified that he has been responsible for design, development, and testing of fractional horsepower motors for Polaroid since 1970. His experience in training personnel in testing procedures caused him to conclude that

proper training required several weeks of instruction. Mr. Peterson also emphasized the importance of the alignment and coupling process in the testing procedure, and supported Mr. Gaza's use of an ammeter and flexible coupling device to insure proper readings.

Mr. Peterson also criticized the screening procedure employed by Customs. He agreed with Mr. Gaza's use of a loadpoint in calculating torque and voltage levels, and believed that the 5–minute test should vary voltage to permit the motor to run at a constant speed. In addition, Mr. Peterson stated that he preferred using 10 samples to allow for bearing malfunctions and other problems unrelated to the horsepower capability of the motors.

Rather than to rely merely on the statutory presumption of correctness that prevails in customs classification cases, the defendant submitted credible and reliable evidence to support its contention that the merchandise was properly classified by Customs. *See NEC America, Inc. v. United States*, 8 CIT 184, 190–91, 596 F.Supp. 466, 471 (1984), *aff'd*, 760 F.2d 1295 (Fed. Cir.1985).

The defendant's witness, Mr. Cecil I. Clements, Chief of the Operations Branch, Technical Services Division of the United States Customs Service, testified that he developed the customs test for fractional horsepower direct current electric motors, and was responsible for the training and supervision of customs personnel in the performance of the test. He explained that the test was based on maximum horsepower output for a controlled period of time because most of the motors in question were not designed for continuous use. He testified that the 5–minute test was patterned directly on the minimum time test recommended and used by the National Electric Manufacturing Association. The validity of the test was further supported by independent laboratory research and suggestions solicited from manufacturers and importers in the field, including International Components Corporation and Igarashi.

Mr. Clements refuted the allegations made by plaintiff's witnesses pertaining to the customs alignment procedures. He stated that the "Lord" coupling device used by Customs was as good, if not better, than those suggested by plaintiff. He stressed that Magtrol, the manufacturer of the dynamometer used by both Customs and International Components Corporation in their testing, expressly recommended the "Lord" coupling device for use with its dynamometer. Mr. Clements also emphasized that the alignment procedure used by Customs was entirely adequate, and that Magtrol did not recommend use of an ammeter in aligning a motor to its dynamometer.

Mr. Clements explained the screening test used by Customs, and rejected the assertions made by plaintiff's witnesses which related to the calculations of torque and voltage levels to be applied during this phase of testing. Mr. Clements found these claims to be irrelevant since the torque and voltage levels applied during the screening test were slowly increased until the motor reached $\frac{1}{40}$ horsepower. He indicated further that the motors were never taken to their stall point unless they were incapable of producing $\frac{1}{40}$ horsepower of output. Mr. Clements stressed that any inconsistent results among customs laboratories were due to the limited capacities of the motors, and not the testing procedures utilized by Customs. He concluded that, in his experience, six samples were sufficient to determine maximum horsepower output for fractional horsepower electric motors using Customs' 5–minute test.

While the tests performed by Mr. Gaza may have indicated a $\frac{1}{40}$ horsepower capability, the procedure and equipment that he used deviated from the test established by Customs. The customs test procedure was closely patterned on the one now used by the National Electric Manufacturing Association, and utilized the coupling specifically recommended by the manufacturer of the dynamometer. Plaintiff used a flexible coupling and added an ammeter to its test procedure, claiming its method to be superior. Defendant's witness refuted this claim, and testified that the customs proce-

dure was as good as, if not better than, plaintiff's.

The evidence indicates that Customs made a reasonable, good faith effort to test the motor's horsepower capability through a fair and accurate procedure. Specific thought was given to the various problems raised by plaintiff, and a testing procedure was developed to test these types of motors accurately and fairly. Plaintiff's basis for its modifications of the procedure is based solely on the testimony of its witness. The opinions of plaintiff's witnesses were not only contrary to the method already in place and used by Customs, but they were also contrary to the methods recommended by the manufacturer of the equipment as well as the National Electric Manufacturing Association. While expert testimony on scientific or technical matters may be persuasive, "[i]t is well established that conclusory statements by a witness which are based solely on his own opinion have little or no probative value." *NEC America, Inc. v. United States*, 8 CIT at 190, 596 F.Supp. at 471; *see also Keer, Maurer Co. v. United States*, 46 CCPA 110, 115, C.A.D. 710 (1959); *Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 22–23, C.D. 4783, 468 F.Supp. 1318, 1325, *aff'd*, 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979).

In support of its assertion that it has presented *"prima facie"* evidence to rebut the presumption of correctness that attaches to the government's classification of the imported merchandise, plaintiff cites *Aluminum Company of America v. United States*, 60 CCPA 148, C.A.D. 1102, 477 F.2d 1396 (1973).

In the *Aluminum Company* case, plaintiff challenged the classification of imported fluorspar as containing not over 97 percent by weight calcium fluoride, under item 522.21 TSUS. The importer claimed the merchandise should have been properly classified as containing 97 percent by weight of calcium fluoride, under item 522.-24 TSUS.

To facilitate testing, samples were taken from the imported lots with some being sent to Customs for laboratory analysis, while others were retained by the importer. Customs, using its laboratory method, found the fluorspar to be under 97 percent. Evidence presented at trial, however, established that the customs chemists' description of their tests omitted some steps and deviated from others. *Aluminum Company of America*, 60 CCPA at 150, 477 F.2d at 1398.

Plaintiff, in *Aluminum Company of America*, applied its own analysis to the merchandise which produced a result different from that submitted by the government. Plaintiff introduced evidence of tests of 10 samples made by 5 different sources, some unrelated to plaintiff, using 2 or 3 different methods, including the *exact* customs method. All of these tests found the samples to be 97 percent calcium fluoride. Additionally, the plaintiff's tests were done in three different laboratories, by three different operators, as opposed to the government's eight sample analyses, all of which were made in the same laboratory, although two chemists participated. Furthermore, the producer testified that it always produced fluorspar for the United States under specifications which required a 97 percent calcium fluoride content, and that fluorspar was a stable material that would not change during importation.

On the evidence of record, and in the absence of any substantial basis for questioning the accuracy of the plaintiff's analyses, the United States Court of Customs and Patent Appeals held that plaintiff had presented a "persuasive case." *Id.* at 152, 477 F.2d at 1400.

The plaintiff here relies on the *Aluminum Company* case for the proposition that, since it conducted its own tests and found contrary to the defendant, that it has removed or refuted defendant's presumption of correctness, and that defendant must now come forward with evidence to rebut "plaintiff's *prima facie* case."

In the present case, the defendant has not only relied on the presumption of correctness, but has also come forward with evidence in support of the customs classification. Furthermore, in view of the factual differences between *Aluminum Company*

*of America* and this case, plaintiff's reliance on the *Aluminum Company* case is misplaced.

In the *Aluminum Company* case it was the government that deviated from the established customs method. Here, it is the plaintiff that altered the procedure. In *Aluminum Company of America*, plaintiff introduced evidence from many sources, most of which followed the *exact* method prescribed by Customs—all yielding results favorable to the plaintiff. In the present case, plaintiff's only evidence that the motors are $\frac{1}{40}$ horsepower are the tests performed by its own president, using its own method, rather than the method utilized by Customs and those recommended by the National Electric Manufacturing Association.

Plaintiff also submits that the government's tests of models identical to those in issue were inconsistent and conflicting. Defendant's witness, however, testified that inconsistent results are not uncommon, and that this did not imply inaccuracy. A conflict of opinion on this issue is not sufficient to hold that the method devised by the customs laboratory was not a reasonable one, or that it would not produce reasonably accurate results. *See Crown Cork & Seal Co. v. United States,* 65 Cust.Ct. 483, 497–498, C.D. 4127 (1970). As stated by the Customs Court in the *Crown Cork & Seal Co.* case:

> Although plaintiff's expert used different methods ... it cannot be said that they were better or superior to the method devised at the customs laboratory. All that can be said is that each witness found some fault with the various procedures used by the other. The more serious criticism would seem to be those mentioned by the government's witness concerning the testing procedure used by plaintiff's expert.

*Id.*

The quoted statement is particularly pertinent here since the method employed by the government is based on that of the National Electric Manufacturing Association's testing procedure, and is in accordance with the dynamometer manufacturer's recommendations. Hence, the court holds that the procedure, training, and methodology of Customs was fair and reasonable.

In view of the foregoing, the court holds that the imported merchandise was properly classified as "Motors: of under $\frac{1}{40}$ horsepower: other" under item 682.25 of the tariff schedules. Accordingly, plaintiff's protest is denied, and the action is dismissed. Judgment will issue accordingly.